**FILED**

**FEBRUARY 22, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| OTIS ELEVATOR COMPANY, | ) | CASE NO. |
| | ) | |
| Plaintiff, | ) | JUDGE |
| | ) | |
| -vs.- | ) | |
| | ) | |
| EMERSON ELECTRIC COMPANY dba | ) | |
| U.S. ELECTRICAL MOTORS, INC. | ) | |
| 8000 West Florissant Avenue | ) | |
| P.O. Box 4100 | ) | |
| St. Louis, MO 63136 | ) | **COMPLAINT** |
| | ) | |
| -and- | ) | |
| | ) | |
| CHAMPLAIN CABLE CORPORATION | ) | |
| 175 Hercules Drive | ) | |
| Colchester, VT 05446-5951, | ) | |
| | ) | |
| Defendants. | ) | **(Jury Demand Endorsed Hereon)** |

**08 C 1107**

**JUDGE GUZMAN**
**MAGISTRATE JUDGE SCHENKIER**

Plaintiff Otis Elevator Company ("Otis"), by and through its attorneys, hereby complains of Defendants Emerson Electric Company dba U.S. Electrical Motors, Inc. ("Emerson") and Champlain Cable Corporation ("Champlain") as follows:

## NATURE OF THE CASE

1.     This is an action for recovery of damages resulting from defective submersible elevator motors marketed, sold and supplied to Otis by Emerson and Champlain.

## PARTIES

2.     Plaintiff Otis is a New Jersey corporation with its principal place of business located in Farmington, Connecticut.

3.    Defendant Emerson is a corporation organized and existing under the laws of the State of Missouri, maintaining its principal place of business at 8000 West Florissant Avenue, P.O. Box 4100, St. Louis, Missouri, 63136.

4.    Defendant Champlain is a corporation organized and existing under the laws of the State of Delaware, maintaining its principal place of business at 175 Hercules Drive, Colchester, Vermont 05446.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), as there exists complete diversity of citizenship between the parties, and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.    Venue is proper in the United States District Court for the Northern District of Illinois, Eastern Division pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to Otis' claim occurred in this District, and specifically in the counties of Lake, Cook and DuPage.

## BACKGROUND

7.    Otis is in the business of manufacturing, installing and maintaining elevators, escalators, moving walkways and other people moving systems.

8.    Defendant Emerson is in the business of designing and manufacturing electrical motors and controls.  Emerson operates several electrical motors divisions, one of which is U.S. Electric Motors, Inc. ("USEM").

9.    Defendant Champlain is a company in the business of manufacturing, designing and supplying wire and cable.

10.    For over 20 years Otis has used Emerson's motors to power its hydraulic elevator systems. Emerson also supplies after-market replacement motors for hydraulic elevators maintained and modernized by Otis.

11.    The Emerson motor is submersed in the hydraulic oil of the elevator's tank. It functions by providing torque which powers a hydraulic pump.

12.    A hydraulic elevator cannot function without a fully operable, defect-free submersible motor.

13.    The contract specifications agreed to by Otis and Emerson, and memorialized in Otis drawing No. 6333DD, dated 99-04-07, require Emerson to produce motors capable of operating without malfunction while fully submersed in oil.

14.    The contract specifications also require Emerson to equip each motor with a "normally closed" automatic Motor Thermal Contact ("MTC") switch which temporarily removes electrical power to the motor when oil temperature exceeds 70°C. The MTC is designed to deactivate, and restore electrical power to the motor, once oil temperature drops below 70°C.

15.    Otis purchases motors from Emerson by issuing purchase orders. Each such purchase order incorporates by express reference a series of terms and conditions specifically identified by Otis on its "Form 3406." A copy of Form 3406 is attached as Exhibit A and incorporated herein. Emerson's motors range in price from approximately $260.00 to $390.00, depending on each motor's rated horsepower.

16.    Form 3406, incorporated by reference into each and every one of Otis' purchase orders to Emerson, provides:

> In addition to any warranty implied by fact or law, Seller expressly warrants all items and/or services will be free from defects in design, manufacture, workmanship and materials, and will conform strictly to applicable specifications, drawings, and

approved samples, if any, and to be fit and sufficient for the purpose intended and to be merchantable. Such warranties, together with all other service warranties of Seller, shall run to Buyer, its successors, assigns and customers.

17.    A portion of the motors Otis purchases from Emerson are shipped from Emerson's Monterey, Mexico production facility to the Otis Service Center ("OSC") in Bloomfield, Connecticut. The motors are stored and maintained at OSC until they are shipped to buildings throughout the country where they are installed in hydraulic elevators.

18.    Emerson also ships motors from its Mexico-based plant directly to Otis' Nogales, Mexico manufacturing facility. There, Emerson's motors are installed in Otis' LVM model hydraulic elevators and subsequently shipped to any Otis job site across the United States.

19.    During all relevant time periods, Champlain supplied Emerson with wire for its submersible motors. Champlain's wire connects the submersible motor to a stand-alone controller which provides the requisite electrical power to enable the motor to function.

20.    Champlain holds itself out to the public as a supplier capable of producing "premium heat defying cable" that is particularly well suited for industrial applications such as submersible hydraulic elevator motors.

21.    Champlain's wiring is coated with a polymeric insulation material designed to resist swelling, deterioration and degradation and to protect the underlying conductive metal wiring. Champlain advertises that its insulated wiring is tested and specifically rated to perform, without defect or malfunction, when exposed to a variety of chemical contaminants including engine oil.

22.    At all times pertinent, Champlain was aware that its polymeric insulated wire was utilized as a component in submersible motors sold by Emerson to Otis.

## FACTS COMMON TO ALL COUNTS

### Emerson Motor Failures in Illinois

23.    Otis restates, reavers and realleges Paragraphs 1 through 22 of its Complaint as the same are set forth in Paragraphs 1 through 22 herein.

24.    In 2004, Otis issued a purchase order, covering a series of Emerson submersible elevator motors.  This purchase order expressly referenced and incorporated the terms and conditions of Form 3406, and the Otis-Emerson agreed upon contract specifications, as memorialized in Otis drawing No. 6333DD.  Emerson shipped the motors from its Monterey, Mexico production facility to OSC, in exchange for Otis' payment of the full purchase order amount.

25.    OSC shipped one of the Emerson motors covered by the purchase order referenced in the preceding paragraph to Otis' field office in Lombard, Illinois, to be installed as a replacement motor in a Westinghouse hydraulic elevator identified as Machine No. D63953, located at the Washington Mutual building in Vernon Hills, in Lake County, Illinois.  The Emerson motor contains a data plate which according to information provided by Emerson indicates a manufacture date of March 2004.  An Otis field mechanic installed the Emerson motor and returned machine No. D63953 to normal operation.

26.    On February 27, 2006, an Otis field mechanic performing a routine elevator inspection of machine No. D63953 at the Washington Mutual building discovered that the elevator had apparently lost all power and was not functioning.

27.    Upon further inspection on February 27, 2006, the mechanic observed that the Emerson motor had unexpectedly short-circuited and lost power.  Subsequent investigation revealed that the polymeric insulation coating the Champlain wire submersed in the elevator's hydraulic oil tank had swelled, deteriorated and degraded and had separated from the underlying

conductive metal wiring. Otis' field mechanics discerned that the elevator apparently shut down because the conductive wiring became exposed, made contact with a metal object inside the elevator's hydraulic oil tank, and short-circuited the motor.

28.     The failed wiring rendered the motor totally inoperable.

29.     Due to the failure of the motor, Machine No. D63953 was rendered totally inoperable and Otis was forced to replace the motor in order to restore normal elevator function.

30.     Otis promptly notified Emerson of the Washington Mutual motor failure. At the specific request of representatives of Emerson, Otis sent the failed motor to Emerson's manufacturing facility in Monterey, Mexico on or about March 26, 2006.

31.     Representatives of Otis repeatedly contacted Emerson seeking information pertaining to the reasons for the apparent wiring and motor failure, requesting a root cause analysis, and urging Emerson to investigate further.

32.     Emerson failed to respond to Otis' many requests, failed to provide a replacement product, and eventually conceded to Otis that the defective motor removed from the Washington Mutual building had been lost, misplaced, discarded or destroyed.

33.     In March of 2007, a second Emerson submersible motor installed at another Washington Mutual elevator in Vernon Hills, also failed. Otis' investigation again revealed similar evidence of degradation and deterioration of the polymeric insulation coating the motor's wiring.

34.     Otis also found evidence of Emerson motor wiring insulation deterioration in April of 2007 at an Otis LVM hydraulic elevator located at the St. Alexius Medical Office building in Hoffman Estates, in Cook County, Illinois; in May of 2007 at an Otis LVM hydraulic unit at Cook Street Plaza in Barrington, in Lake County, Illinois; in June of 2007 at an Otis LVM hydraulic elevator located at Hampton Inn in Bolingbrook, in DuPage County, Illinois, and

finally in November of 2007 at an Otis hydraulic elevator at the Courtyard by Marriott in Schaumburg, in Cook County, Illinois.

35.    In each of the instances set forth in the preceding paragraph, Otis field mechanics observed that the polymeric insulation coating the wires of Emerson's motors exhibited swelling, degradation and deterioration.

### Investigation Reveals More Emerson Motor Failures
### and Two Years of Substandard Wire

36.    Otis restates, reavers and realleges Paragraphs 1 through 36 of its Complaint as the same are set forth in Paragraphs 1 through 36 herein.

37.    In early 2006, through a purchase order issued pursuant to the terms and conditions of Form 3406, Emerson supplied Otis with a series of 50 horsepower motors to be incorporated into new Otis LVM hydraulic elevators for assembly at Otis' Nogales, Mexico plant. One of the motors, manufactured by Emerson in June of 2006 at its Monterey, Mexico plant was installed into Otis LVM Machine No. 482994.

38.    Machine No. 482994 was installed on or about May 1, 2007 at the Intuit building, 7555 Torrey Santa Fe Road in San Diego, California, 92129.

39.    On or about August 9, 2007, during a routine field examination, an Otis mechanic discovered that machine No. 482994 lost power. Upon inspection, the mechanic determined that the Emerson motor short-circuited; the polymeric insulation of the motor's wiring had deteriorated to such a degree that it exposed the underlying conductive wire to an interior metal wall of the machine's hydraulic oil tank.

40.    The deteriorated wiring insulation rendered the motor fully inoperable and Otis was forced to replace it in its entirety.

41.     Subsequent to the Illinois and California Emerson motor failures, Otis launched a nationwide inspection of motors supplied by Emerson since 2004. That inspection revealed frequent and widespread evidence of wire insulation deterioration and degradation.

42.     In an e-mail dated October 11, 2007, Emerson revealed to Otis for the first time that Champlain had provided "sub-standard wire" during the time period of September 1, 2004 through September 30, 2006. See true and accurate copy of October 11, 2007 e-mail attached as Exhibit B.

43.     According to Emerson, Champlain temporarily supplied its "Exar SFX" brand insulated wire instead of the "Exar 150" brand Emerson's contract specifications require.

44.     The "Exar 150" brand had been used without incident or malfunction for decades in motors supplied to Otis by Emerson and to Otis' knowledge never exhibited signs of swelling, deterioration or degradation.

45.     This wiring change was made by Champlain without the knowledge, consent or authority of Otis.

46.     According to information supplied to Otis by Emerson, this substandard wiring change was also made without the approval, consent, or even knowledge of Emerson.

47.     Otis' investigation further revealed that the polymeric insulation of "Exar SFX" wire is of inadequate composition for use in hydraulic elevators and is highly susceptible to swelling, deterioration and degradation when submersed in oil.

48.     Emerson also revealed to Otis in a September 6, 2007 letter that these motors were incapable of operating up to the MTC trigger temperature of 70°C, and instead are only designed to operate below 50°C. See true and accurate copy of September 6, 2007 letter attached as Exhibit C.

49.     In the several decades that preceded the sale of the substandard wiring, the

Emerson motors Otis installed in hydraulic elevators routinely and regularly operated at temperatures up to and beyond 70°C, without incident, malfunction or defect.

50.    During the time period of 2004 through 2006, Otis purchased in excess of 10,000 submersible motors from Emerson.

**COUNT ONE**
**BREACH OF EXPRESS WARRANTY**

**810 ILCS § 5/2-313, 810 ILCS § 5/2-318**

51.    Otis restates, reavers and realleges Paragraphs 1 through 51 of its Complaint as the same are set forth in Paragraphs 1 through 51 herein.

52.    During the approximate time period of 2004 through 2006, through the issuance of purchase orders, Emerson sold and delivered to Otis in excess of 10,000 submersible elevator motors for a total purchase price approximating $3,000,000. This sum was paid in full by Otis to Emerson.

53.    At the time of each sale over the course of this period, Otis relied on representations that Emerson's motors would be free from defects in design, manufacture, workmanship and materials and would conform strictly to the contract terms the parties agreed to, pursuant to Form 3406, and to all specifications, including Otis drawing No. 6333DD.

54.    At the time of sale and as part of each and every sale, Emerson warranted to Otis that its motors were:

> free from such defects in design, manufacture, workmanship and material, and (that they would) conform strictly to applicable specifications, drawings . . . . See Form 3406, Exhibit A.

55.    In purchasing the motors described in this Complaint, Otis relied on the express warranties as represented by Emerson, and on those affirmations repeatedly given to Otis during the course of the parties' 20+ year relationship.

56.    Champlain, at all times pertinent, was aware that its polymeric insulated wire was utilized as a component in motors sold to Otis. Champlain knew the tolerances and requirements for the hydraulic elevator tank application, and expressly warranted to Emerson that its insulated wire could be used in elevator motors.

57.    Otis was an intended third-party beneficiary of the express warranty between Emerson and Champlain.

58.    Emerson and Champlain breached the express warranties described in this Complaint by supplying in excess of 10,000 submersible motors that do not conform to the parties' agreed-upon specifications. Specifically, Emerson provided motors manufactured on and after 2004 which contained non-specified substandard Champlain wiring that is incapable of resisting hydraulic elevator oil, and is thus highly susceptible to severe polymeric insulation swell, deterioration and degradation.

59.    Otis discovered this breach of warranty and immediately gave written notice to Emerson of the breach, as set forth above.

60.    Pursuant to Chapter 810, Illinois General Compiled Statutes § 5/2-714, Otis is entitled to recover damages from Emerson and Champlain constituting the difference between the value of each Emerson motor it accepted and the value each would have had if it had been as warranted. Damages are currently immeasurable, but capable of precise ascertainment at the time of trial, and approximate $3,000,000.

61.    Otis is also entitled to damages representing labor costs in performing any and all repairs and/or replacements to the defective motors provided by Emerson and Champlain, lost profits, loss of use, loss of customer goodwill, and business interruption expenses in a total amount currently immeasurable but capable of precise ascertainment at the time of trial and approximating $10,000,000.

**COUNT TWO**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

**810 ILCS § 5/2-314, 810 ILCS § 5/2-318**

62.    Otis restates, reavers and realleges Paragraphs 1 through 62 of its Complaint as the same are set forth in Paragraphs 1 through 62 herein.

63.    During a time period beginning in 2004, through the issuance of purchase orders, Emerson sold and delivered to Otis in excess of 10,000 submersible elevator motors for a total purchase price approximating $3,000,000. This sum was paid in full by Otis to Emerson.

64.    The contracts of sale, purchase orders between Otis and Emerson, contained an implied warranty that the motors would be of merchantable quality.

65.    Champlain, at all times pertinent, was aware that its polymeric insulated wire was utilized as a component in motors sold to Otis. Champlain knew the tolerances and requirements for the hydraulic elevator tank application, and impliedly warranted to Emerson that its insulated wire was merchantable.

66.    Otis was an intended third-party beneficiary of the implied warranty of merchantability between Emerson and Champlain.

67.    The motors provided by Emerson and Champlain are not merchantable because they are incapable of functioning properly in hydraulic elevator systems. The polymeric insulated wiring employed during the 2004 through 2006 "sub-standard" usage time period is highly susceptible to swelling, deterioration and degradation and is unable to properly resist

-11-

hydraulic elevator oil.

68.    Otis discovered this breach of implied warranty and immediately gave written notice to Emerson in March of 2006.

69.    Otis has attempted to use the Emerson motors in the manner and for the purpose for which they were intended yet the motors have systematically failed.

70.    Pursuant to Section 810, Illinois General Compiled Statutes § 5/2-714, Otis is entitled to recovery of damages from Emerson and Champlain constituting the difference between the value of each Emerson motor it accepted and the value each would have had if it had been as warranted. Damages are currently immeasurable, but capable of precise ascertainment at the time of trial, and approximate $3,000,000.

71.    Otis is also entitled to damages representing labor costs in performing any and all repairs and/or replacements to the defective motors provided by Emerson and Champlain, lost profits, loss of use, loss of customer goodwill, and business interruption expenses in a total amount currently immeasurable but capable of precise ascertainment at the time of trial and approximating $10,000,000.

## COUNT THREE
## BREACH OF IMPLIED WARRANTY
## OF FITNESS FOR PARTICULAR PURPOSE

### 810 ILCS § 5/2-315, 810 ILCS § 5/2-318

72.    Otis restates, reavers and realleges Paragraphs 1 through 72 of its Complaint as the same are set forth in Paragraphs 1 through 72 herein.

73.    During a time period beginning in 2004, through the issuance of purchase orders, Emerson sold and delivered to Otis in excess of 10,000 submersible elevator motors for a total purchase price approximating $3,000,000. This sum was paid in full by Otis to Emerson.

74.    The contracts of sale, purchase orders between Otis and Emerson, contained an

implied warranty that the motors would be fit for the particular purpose of providing electrical power to hydraulic elevator systems while submersed in hydraulic oil.

75.    Emerson specifically markets its products as "Special Application Submersible Elevator Motors," and is therefore aware of the particular purpose for which these motors are required.

76.    At all times pertinent, Emerson was aware that Otis was relying on its skill, judgment and technical expertise in designing and manufacturing submersible elevator motors fit for this particular purpose.

77.    Champlain, at all times pertinent, was aware that its polymeric insulated wire was utilized as a component in motors sold to Otis. Champlain knew the tolerances and requirements for the hydraulic elevator tank application, and impliedly warranted to Emerson that its insulated wire was fit for this particular purpose.

78.    Otis was an intended third-party beneficiary of the implied warranty of fitness for a particular purpose between Emerson and Champlain.

79.    Emerson's motors are not fit for this particular purpose because the composition of the polymeric insulation coating renders each motor's exterior wires highly susceptible to swelling, deterioration and degradation.

80.    Otis discovered this breach of implied warranty and immediately gave written notice to Emerson in March of 2006.

81.    Otis has attempted to use the Emerson motors and Champlain's wiring in the manner and for the particular purposes for which they were intended yet the motors and wiring have systematically failed.

82.    Pursuant to Section 810, Illinois General Compiled Statutes § 5/2-714, Otis is entitled to recover damages from Emerson and Champlain constituting the difference between the value of each Emerson motor it accepted and the value each would have had if it had been as warranted.  Damages are currently immeasurable, but capable of precise ascertainment at the time of trial, and approximate $3,000,000.

83.    Otis is also entitled to damages representing labor costs in performing any and all repairs and/or replacements to the defective motors provided by Emerson and Champlain, lost profits, loss of use, loss of customer goodwill, and business interruption expenses in a total amount currently immeasurable but capable of precise ascertainment at the time of trial and approximating $10,000,000.

## COUNT FOUR
## NEGLIGENCE

84.    Otis restates, reavers and realleges Paragraphs 1 through 84 of its Complaint as the same are set forth in Paragraphs 1 through 84 herein.

85.    In March of 2006, after receiving notification from Otis that its submersible motor had failed, Emerson requested that Otis send the motor to its Monterey, Mexico plant.

86.    Otis urged Emerson to investigate and to immediately respond if that investigation revealed any defect in manufacture, design or otherwise that required corrective action.

87.    Emerson voluntarily entered into an agreement whereby Otis would return the failed motor to Emerson in exchange for Emerson's assurance that it would conduct a thorough investigation and root cause analysis and fully disclose any and all results of that investigation and analysis to Otis.

88.     In entering into this agreement in March of 2006 with Otis, Emerson reasonably understood that it voluntarily assumed a duty to take possession of the failed motor, and to properly maintain and preserve it; to fully disclose to Otis the results of any and all investigation and root cause analysis; and to assist in identifying and assessing the need for any remedial or corrective repair or replacement work.

89.     In response to this request and in exchange for Emerson's assurance that it would fully disclose the results of any and all investigation, Otis sent Emerson the failed motor from the Washington Mutual Insurance building in Vernon Hills, Illinois on or about March 26, 2006.

90.     Emerson failed to immediately notify Otis of any motor defect whatsoever, including the substandard Champlain wiring, thereby prompting Otis to continue purchasing Emerson's motors, and to continue installing these motors in new and existing hydraulic elevators throughout the United States.

91.     Emerson breached its agreement with Otis and breached the duty it voluntarily undertook to preserve this evidence by losing, misplacing, discarding or destroying the motor.

92.     The spoliation of this evidence also constitutes a breach of the voluntary duty Emerson undertook to fully investigate and promptly reveal any defect in the motors it continued to sell. This breach directly and proximately caused damage in that Otis unknowingly continued purchasing and installing defective motors.

93.     Despite the duty it voluntarily undertook in March of 2006 to promptly notify Otis of any defect in its motors, Emerson did not inform Otis of the substandard Champlain wiring until October 11, 2007, seventeen months later. (See Exhibit B).

94.     As set forth in Exhibit B, Champlain supplied substandard wiring until September 30, 2006. Emerson thus sold Otis several thousand defective motors after voluntarily undertaking this duty and breaching it by spoliating critical evidence.

95.     Otis is entitled to damages as a direct and proximate result of Emerson's breach of its duty in an amount currently immeasurable but capable of precise ascertainment at the time of trial and approximating $10,000,000, including but not limited to the costs of repair and/or replacement for all defective motors sold to Otis by Emerson.

## COUNT FIVE
## BREACH OF CONTRACT

96.     Otis restates, reavers and realleges Paragraphs 1 through 96 of its Complaint as the same are set forth in Paragraphs 1 through 96 herein.

97.     Champlain entered into a contract with Emerson whereby Champlain agreed to provide polymeric insulated wiring, marketed as "premium heat defying cable" for installation in Emerson's submersible electrical motors.

98.     Emerson specifically qualified Champlain as an "approved source" for the wiring to be incorporated into the electrical motors sold to Otis.

99.     Champlain, at all times pertinent, was aware that its polymeric insulated wire was utilized as a component in motors sold to Otis. Champlain knew it was supplying product for subsequent sale to Otis, knew the tolerances and requirements for the hydraulic elevator tank application, and specifically marketed its insulated wire for use in elevator motors.

100.    Otis was an intended third-party beneficiary of the contract between Emerson and Champlain.

101.    The Emerson-Champlain contract incorporated specifications which expressly required Emerson's motors to contain "Exar 150" polymeric insulated wire.  These same specifications also obligated Champlain to submit for approval to Emerson's engineering division any proposed wiring substitution; "any proposed substitution must be submitted to the engineering department for approval."  See USEM Wire, Motor Lead Drawing No. 392021, attached as Exhibit D.

102.    During the time period of September 1, 2004 through September 30, 2006, Champlain supplied Emerson with substandard "Exar SFX" wire instead of the contract-mandated "Exar 150" wiring.  This wiring was incorporated into more than 10,000 submersible motors sold by Emerson to Otis.

103.    This wiring substitution was made without the knowledge, authority, consent or approval of Otis.

104.    Upon information and belief, Champlain's wiring substitution was also not submitted to, nor approved by, Emerson.

105.    According to the express terms of the Emerson-Champlain contract, Champlain has materially breached its contract by substituting substandard polymeric insulation without Emerson's approval.

106.    As a direct and proximate consequence of Champlain's material breach, Otis, an intended third-party beneficiary of the Emerson Champlain contract, has sustained damages.

107.    Otis' damages are currently immeasurable, but capable of precise ascertainment at the time of trial, including the cost to repair and/or replace each and every Emerson motor containing defective polymeric insulation wiring manufactured and supplied by Champlain.

108.    Otis is also entitled to damages representing labor costs in performing any and all repairs necessitated by Champlain's defective wiring, lost profits, loss of use, loss of customer goodwill, and business interruption expenses in a total amount currently immeasurable but capable of precise ascertainment at the time of trial and approximating $10,000,000.

<u>COUNT SIX</u>
<u>PRODUCT LIABILITY</u>

109.    Otis restates, reavers and realleges Paragraphs 1 through 109 of its Complaint as the same are set forth in Paragraphs 1 through 109 herein.

110.    The wiring supplied by Champlain between the time period of 2004 through 2006, and incorporated into submersible elevator motors sold by Emerson to Otis was defective in design and/or manufacture.

111.    The "Exar SFX" wire is of inadequate composition for use in hydraulic elevators and is highly susceptible to swelling, deterioration and degradation when submersed in oil.

112.    The defective condition of Champlain's "Exar SFX" wire existed at the time the wiring left Champlain's control.

113.    As a direct and proximate cause of its sale of defective wiring, Champlain has caused damage to Otis.  Specifically, Champlain's polymeric insulation swells, deteriorates and degrades, subjecting more than 10,000 Emerson submersible motors sold to Otis to sudden failure.

114.    As a consequence of Champlain's defective wiring, Otis has, and will continue to be damaged in that the motors containing this substandard wire must be replaced in their entirety in order to avoid rendering all affected hydraulic elevators inoperable.  Damages for this replacement are currently immeasurable, but capable of precise ascertainment at the time of trial, and approximate $3,000,000.00.

115.     Otis is also entitled to damages representing labor costs in performing any and all repairs to Emerson's defective motors necessitated by Champlain's defective wiring, lost profits, loss of use, loss of customer goodwill, and business interruption expenses in a total amount currently immeasurable but capable of precise ascertainment at the time of trial and approximating $10,000,000.

WHEREFORE, Plaintiff Otis Elevator Company prays that this Court:

1.     Award all damages to it and against Emerson and Champlain caused by their breaches of express and implied warranties of merchantability, and fitness for a particular purpose, breach of contact, and defective products, as alleged in Counts One, Two, Three, Five and Six;

2.     Award to Otis and against Emerson, all damages caused by its negligence in spoliating evidence critical to Otis' prosecution and pursuit of recovery in this action, as alleged in Count Four;

3.     Award to Otis and against Emerson and Champlain Otis' attorneys' fees, interest and the costs of this action; and

4.     Award to Otis and against Emerson and Champlain such other legal and equitable relief that the Court deems just and proper in these circumstances in accordance with Rule 54(c) of the Federal Rules of Civil Procedure.

Respectfully submitted,

s/Steven P. Rouse
STEVEN P. ROUSE (6189672)
MENGES & MOLZAHN, L.L.C.
20 North Clark Street, Suite 2300
Chicago, IL 60602-5002
Telephone:     (312) 917-1880
Facsimile:     (312) 917-1851
E-Mail:     pcr@menges.com
*Attorneys for Plaintiff*
*Otis Elevator Company*

*Of Counsel:*

HARRY D. CORNETT, JR. (Ohio Bar No. 0013179)
THOMAS W. BAKER (Ohio Bar No. 0070558)
Tucker Ellis & West LLP
925 Euclid Avenue
1150 Huntington Building
Cleveland, Ohio 44115-1414
Telephone:      (216) 592-5000
Facsimile:       (216) 592-5009
E-Mail:          HCornett@tuckerellis.com
                 TBaker@tuckerellis.com

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Otis Elevator Company demands a trial by jury on all issues so triable.

Respectfully submitted,

s/Steven P. Rouse
One of the Attorneys for Plaintiff
Otis Elevator Company

GENERAL TERMS AND CONDITIONS

UNLESS OTHERWISE EXPRESSLY AGREED IN WRITING, ALL PURCHASES ARE SUBJECT TO THE
FOLLOWING TERMS AND CONDITIONS:

1.  **Agreement and Acceptance:** Any of the following acts by Seller shall constitute acceptance of this order and all of its terms and conditions: delivery of any of the items ordered; commencement of performance; informing Buyer of Seller's commencement of performance; returning Seller's own form of acknowledgment; or notice to Buyer of delivery schedule. Any term or condition stated by Seller in any prior proposal or in acknowledging or otherwise accepting this order, whether verbally, in writing or electronically, shall not be binding on Buyer unless specifically accepted by Buyer in writing. Buyer will not be bound to any prices or delivery to which it has not specifically agreed in writing.

2.  **Delivery, Transit, Quantity:**

    **2.1  Delivery:** Seller shall furnish the items called for by this order in accordance with the delivery terms stated on the face of this order. If delivery dates are not stated, Seller shall offer Buyer its best delivery dates (which shall be subject to written acceptance by Buyer). Buyer may defer payment or return at Seller's expense, any items delivered in advance of the scheduled delivery date or in excess of the quantity specified for such items.

    **2.2  Notice of Delay:** Whenever an actual or potential reason for delay (including but not limited to labor disputes), delays or threatens to delay the timely performance of this order, Seller agrees to immediately notify Buyer in writing of all relevant information and to make and pay for all necessary changes to fulfill its obligations hereunder and mitigate the potential impact of any such delay.

    **2.3  Cessation of Production:** Seller shall give Buyer at least 180 days prior written notice of the permanent discontinuance of production of items covered by this order.

    **2.4  Late Delivery and Risk of Loss:** Seller agrees to deliver the materials furnished hereunder F.O.B. Buyer's destination and insure such materials for the full value thereof while in transit to the Buyer, any terms and conditions to the contrary notwithstanding. Time is of the essence for this order. No acts of Buyer shall constitute a waiver of this provision. Seller agrees to perform in a timely fashion and shall be responsible for any damages or losses incurred by or through Buyer as a result of untimely performance. Seller shall bear all risk of loss on items covered by this order until final acceptance at destination specified on the face of this order.

    **2.5  Packing:** Seller shall not charge for packaging, packing or boxing, unless Buyer has agreed to such charges in writing. Seller shall not combine in the same container, material that is to be delivered to different receiving locations.

    **2.6  Marking:** Exterior containers shall be marked with the following: 1. Address, including specified details; 2. Purchase order number; 3. Part number; and 4. Special markings called for on purchase order or release.

    **2.7  Bills of Lading:** Bills of Lading shall reference purchase order number and Receiving address. When delivery point is F.O.B. origin, NO declaration of value shall be made on bill of lading EXCEPT where a declaration of value will result in lower total cost of shipment, and then such value shall be declared as will result in the lowest applicable transportation rates. The original copy of the bill of lading shall be mailed to: Buyer's applicable Accounts Payable Department with the invoice.

    **2.8  Shipping and Approved Carriers:** On orders where Buyer either pays for or reimburses Seller directly for shipping costs, goods shall be shipped in accordance with routing instructions furnished by Buyer. If such instructions are not received, goods shall be shipped via least expensive method sufficient to meet delivery requirements, but always through United Technologies Corporation ("UTC") approved carriers.

    **2.9  Packing Slip:** Seller shall include an itemized packing slip with all shipments that will adequately identify the goods shipped, including Otis part number.

    **2.10  Invoice:** Seller shall render a separate invoice to Buyer's Accounts Payable Department on the day each shipment is made pursuant to this order and shall indicate thereon the applicable purchase order number.

    **2.11  Test Reports:** All Test Reports or other test results shall be provided to Buyer upon request.

    **2.12  Hazardous Materials:** If the products or materials to be shipped under this purchase order have been classed as hazardous materials by the U.S. Government or any state or local government, Seller warrants that the product shall be packaged, marked, labeled and transported in full compliance with all applicable laws. Seller shall hold harmless and indemnify Buyer for Seller's failure to comply with the requirements of this provision.

3.  **Invoices and Sales Taxes:**

    **3.1  Invoices:** Payment of invoice shall not constitute acceptance of items ordered and shall be subject to appropriate adjustment for failure of Seller to meet the requirements of this order. Buyer may set off any amount owed by Seller or any of its affiliated companies to Buyer against any amount owed by Buyer hereunder.

Form 3406 Rev. 11/2004

EXHIBIT A

OTIS-EM 00001

2

**3.2 Lowest Prices:** Seller Warrants that the prices charged for the items covered by this order are as low as the lowest prices charged by the Seller to any other customers for similar items in the same or smaller quantities and under like circumstances.

**3.3 Destination:** Seller's invoice shall show the destination to which the material invoiced was shipped

**3.4 Cash Discount:** The cash discount period, if any, shall be computed as commencing with receipt by Buyer of invoice or of merchandise, whichever is later.

**3.5 Sales Tax:** Unless otherwise agreed by Buyer, any article covered by this order will become a component part of the product manufactured by Buyer and is bought for resale, and no retail sales tax is applicable.

**4.      Seller's Financial Status:**  Buyer shall have the right to terminate this order or any part thereof for default without further cost or liability to Buyer if any one of the following occurs:  filing of a voluntary petition in bankruptcy by Seller; filing of an involuntary petition to have Seller declared bankrupt; the appointment of a receiver or trustee for Seller; or the execution by Seller of an assignment for the benefit of creditors.

**5.      Changes:**  Buyer may at any time, by written change order, suspend performance of this order in whole or in part, make changes in drawings, designs, specifications, method of shipment or packing, alter the time or place of delivery, or require additional or diminished work.. Seller's claims for adjustment under this Article shall be deemed waived unless asserted in writing (including the amount of the claim) and delivered to Buyer within thirty (30) days from the date Seller receives the change order.

**6.      Inspection, Rejection, Acceptance:**  All items covered by this order may be inspected and tested by Buyer or its designee, at all reasonable times and places.  Seller shall provide, without additional charge, all reasonable facilities and assistance for such inspections and tests. All inspection records relating to items covered by this order shall be available to Buyer during the performance of this order and for such longer periods as specified by Buyer in its acceptance of the inspection procedures. The material furnished hereunder shall have zero defects, and Seller has the obligation to properly inspect such items prior to delivery to Buyer.  If any items covered by this order are defective or otherwise not in conformity with the requirements of this order, Buyer may, (i)  rescind this order as to such items;  (ii) accept such items at an equitable reduction in price; or (iii) reject such items and require the delivery of replacements.  Deliveries of replacements shall be accompanied by a written notice specifying that such items are replacements.  If Seller fails to deliver required replacements promptly, Buyer may (i)  replace, obtain or correct such items and charge Seller the cost occasioned Buyer thereby, or (ii) terminate this order for cause as provided in Article 16(b). Material rejected is to be returned to Seller, at Seller's expense, for transportation both ways.

**7.      Indemnification, Liability, Costs or Expenses:**  Seller shall indemnify, protect, defend and save Buyer harmless from all suits, claims, loss, damages, injuries, costs or expenses (including attorneys fees) arising out of, or in any way connected with, Seller's performance hereof (including with regard to the failure or malfunction of any product or material furnished hereunder and the consequences of such failure or malfunction) whether incurred by way of litigation, settlement, ADR, or prelitigation proceedings. Should the execution of this order involve work on premises other than those regularly occupied by Seller, Seller shall indemnify, protect, defend and save Buyer harmless from and against all claims for injury (including death) to persons or damage to property caused by Seller's act or omission during the performance of the work.  In the event that Buyer is held liable or incurs any cost or expense due to Seller's delay, or negligence, improper performance or failure to perform or for any defect or malfunction in any material or product, Seller shall indemnify Buyer and pay for all such liability, costs or expenses. Under no circumstances shall Buyer be liable for any special, indirect or consequential damages of any kind.

**8.      Insurance:**  During the performance of the work Seller shall maintain insurance covering its liability to its employees and to others, including its liability to Buyer, under the provisions of this Agreement, in types, amounts and with companies satisfactory to Buyer, and Seller shall furnish Buyer, when requested, insurance certificates certifying that such insurance is in effect. If requested by Buyer, Seller shall name Buyer as additional insured on its Commercial General Liability and Automobile Liability policies, which, along with Seller's Workers' Compensation and Property policies, shall contain a waiver of subrogation in favor of Buyer.  Seller's insurance shall be primary and non-contributory to the insurance of Buyer.

**9.      Warranty:**  In addition to any warranty implied by fact or law, Seller expressly warrants all items and/or services will be free from defects in design, manufacture, workmanship and materials, and will conform strictly to applicable specifications, drawings, and approved samples, if any, and to be fit and sufficient for the purpose intended and to be merchantable.  Such warranties, together with all other service warranties of Seller, shall run to Buyer, its successors, assigns and customers.  All warranties shall survive inspection, test, acceptance of and payment by Buyer.  Seller further warrants that all goods sold and services provided to Buyer shall in all respects meet or exceed applicable safety standards of OSHA and of any other applicable governmental and industry codes and standards, and that all work will be performed in a professional manner.

**10.      Patents and Copyrights:**  Seller shall defend, at its own expense, any suit or claim that may be instituted against Buyer or any customer of Buyer for alleged infringement of patents, copyrights or other intellectual property matters relating to any material or article furnished pursuant to this order, except for any such infringement resulting from detailed designs provided by Buyer, and Seller shall indemnify, hold harmless and defend Buyer and its customers in connection with all suits, claims, liability, loss, damages, costs or expenses arising out of or in any way connected with such alleged infringements. Buyer shall have the

OTIS-EM 00002

3

right at no additional charge to use and/or reproduce the Seller's applicable literature, such as operating and maintenance manuals, technical publications, prints, drawings, training manuals and other similar supporting documentation and sales literature. Seller shall supply Buyer with any updated information relative to such literature and documentation.

**11.    Proprietary Information:** All written or electronic information obtained by Seller from Buyer in connection with this order is received in confidence and shall remain the property of Buyer regardless of whether Buyer labels such information confidential or proprietary or does not label it at all, and shall be used and disclosed by Seller only to the extent necessary for the performance of this order.

**12.    Publicity:** Seller shall not make or authorize any news release, advertisement, or other disclosure which shall deny or confirm the existence of this order or which shall make use of Buyer's name without the prior written consent of Buyer, except as may be reasonably required to perform this order.

**13.    Tooling:** Should Buyer furnish or Seller furnish at Buyer's expense, tooling (including materials, drawings, tools, dies, jigs, gauges, fixtures, patterns, molds, testing apparatuses, machinery, equipment and the like), such tooling shall be the property of Buyer, subject to repossession by Buyer at its option. Seller shall be liable for risk of loss of such tooling while in Seller's possession and shall deliver same to Buyer in the same condition as received by Seller, reasonable wear and tear excepted. Should Seller be unable to deliver goods pursuant to this Agreement then in addition to tooling, Buyer, by written notice, may vest in itself title to finished parts, raw materials or work in process associated with this Agreement, and Seller shall deliver all such material to such location or locations outside its facility as may be designated by Buyer. Buyer shall have the option, upon termination of this Agreement, to purchase, at Seller's cost less depreciation, all machinery of Seller utilized in the manufacture of goods pursuant to this Agreement which are not goods of Seller's design. If Seller has blanket insurance already in effect that Buyer can use for any such company tooling, Seller shall not include any insurance cost for that purpose, in the prices charged hereunder. When Buyer furnishes any material for the manufacture of parts or assemblies Seller shall not substitute material from any other source nor shall Seller alter the physical or chemical properties except with Buyer's written approval.

**14.    Prime or Customer Contract Requirements:** When the Seller's work hereunder will form a part of the work, whether goods or services, under a contract that Buyer has with another or others, Seller agrees, by its acceptance hereof, to be bound to Buyer in the same manner and to the same extent that Buyer is bound to its customer. Seller further agrees that Buyer's contract with its customer is incorporated herein and forms an integral part of this order/agreement and that it has examined the drawings, specifications, terms and conditions of such contract and that it will be bound by such drawings, specifications, terms and conditions. Access to all such documentation will be provided to Seller upon request

**15.    Assignment and Subcontracting:**

   **15.1** No purported assignment or subcontracting of the work by Seller shall be binding on Buyer without Buyer's written consent.

   **15.2** Buyer shall have the right to reduce and set off against amounts payable hereunder any indebtedness or other claim which Buyer may have against Seller, however and whenever arising.

   **15.3** Seller shall not subcontract any work called for by this order without Buyer's prior written approval.

**16.    Termination:**

   **(a) For Convenience:** Buyer may terminate, for its convenience, all or any part of this order at any time by written notice to Seller, in which case Buyer will pay reasonable cancellation charges in accordance with industry practice. In no event shall cancellation charges exceed the total contract price.

   **(b) For Cause:** If (i) Seller fails to make any delivery or perform any services in accordance with specified delivery dates or otherwise fails to comply with this order and does not remedy such failure within a reasonable time after receipt of written notice thereof, (ii) Seller fails to make progress to such an extent that performance of this order is endangered, (iii) any proceeding is filed by or against Seller in bankruptcy or insolvency, or for appointment for the benefit of creditors, or (iv) Seller commits any other breach of this order, Buyer may (in addition to any other right or remedy provided by this order or by law) terminate all or any part of this order by written notice to Seller without any liability and may purchase substitute items elsewhere. Seller shall be liable to Buyer for any cost occasioned Buyer thereby. Buyer also may require Seller to transfer title and deliver to Buyer any completed supplies, and such partially completed supplies and materials, parts, tools, dies, jigs, fixtures, plans, drawings, information, and contract rights as Seller has specifically produced or specifically acquired for the performance of such part of this contract.

**17.    Excessive Stock:** To avoid excessive stocks of fabricated parts in the event of a reduction or termination of this order, Seller shall manufacture only sufficiently in advance of the schedule set forth herein to meet the deliveries required by such schedule, unless expressly permitted to exceed that schedule by Buyer.

   **17.1 Excessive Raw Material:** Seller agrees it is responsible for its own raw material supplies and Buyer shall not be billed for such supplies upon the cancellation of orders or any other reasons.

T&C New Version 11 2004
FORM 3406 REV. 11/2004

3

OTIS-EM 00003

4

18.     **Entirety of Agreement:** This purchase order constitutes the entire agreement between Seller and Buyer, with respect to the material furnished hereunder, unless subsequently modified in writing by both parties or by supplemental documents furnished by Buyer pursuant to this Agreement.

19.     **Laws:** By the acceptance of this order Seller represents and warrants to Buyer that in performance of this order it will fully comply with all applicable Federal and State laws, municipal ordinances, regulations, titles, labor agreements and working conditions to which the goods are subject. In addition to, and not in lieu of the above, Seller represents and warrants that at the time the goods were accepted by Buyer, the goods meet or exceed the applicable standards imposed by the Consumer Products Safety Act, the goods meet or exceed the safety and health standards established and promulgated under the Federal Occupational Safety and Health Act (Public Law 91-596) and its regulations in effect as of date of the awarding of this order, and that Seller has fully complied with the Equal Pay Act and applicable provisions of the Fair Labor Standards Act of 1938 as amended. This purchase order and all questions arising therefrom shall be governed and construed in accordance with the laws of the State of Connecticut.

20.     **Safety Policy:** Minimum Safety Requirements for Sellers/Contractors Working on Buyer's Project Sites are contained herein; and if Seller is unable or unwilling to comply with such requirements, the purchase order can be withdrawn without further recourse by Seller. Specifically, and without limitation, Seller agrees to: 1.    Comply with the applicable Federal, State or Provincial occupational health and/or safety legislation or regulations for both construction and industrial relations. 2.    Supply to employees and require that all employees wear specified safety equipment. Eye protection, and foot protection are mandatory. 3. Adhere to all Buyer's safety requirements and instructions as indicated by Buyer or Buyer's representatives. 4.  Immediately prior to commencement of any work or service, contact a responsible Buyer representative. 5.   Submit the Workers' Compensation Board Firm Number to the safety office.

21.     **Waiver:** The failure of Buyer to insist upon the performance of any provision of this order shall not be construed as waiving any such provision or any other provision.

22.     **Affirmative Action, Minority Business:**

22.1 The following Federal Rules and Regulations, as amended, are incorporated in this contract or purchase order by reference, unless exempt thereunder, and constitute an obligation of the Seller or Contractor to Buyer, or its contracting division, or subsidiary, in the performance of this purchase order or contract.

(a) Equal Employment Opportunity Executive Order 11246, paragraphs (1)-(7) of Section 60-1.4 (a) of the Rules and Regulations of the Department of Labor, Office of Federal Contract Compliance, Equal Employment Opportunity (41CFR Ch. 60).

(b) Employment of Veterans (41 CFR Part 50-250.3)

(c) Employment of the Handicapped (41 CFR Section 60-741.4)

(d) Any other applicable affirmative action and minority business laws.

22.2 **Utilization of Minority Business Enterprises:** The portions of the Federal Procurement Regulations, Sub-part 1-1.13 issued pursuant to Executive Order 11625, apply to and are incorporated in this contract or purchase order and constitute an obligation of the Seller to Buyer.

(a) It is the policy of the United States Government that minority business enterprises shall have the maximum practicable opportunity to participate in the performance of Government contracts.

(b) The Seller agrees to use his best efforts to carry out this policy in the award of his subcontracts to the fullest extent consistent with the efficient performance of this contract.

23.     **Gratuities:** It shall be deemed a default subject to termination if it is found that Seller made, directly or indirectly, any bribes, kickbacks, or other payments, regardless of form, whether in money, property, or services to any person or entity acting on behalf of Buyer, to obtain favorable treatment in securing business or to otherwise obtain special concession, or to pay for favorable treatment for business secured or for special concessions already obtained.

OTIS-EM 00004

RE: Failed motor leads                                                                    Page 1 of 5

**From:**    Gerard.Stoner@emotors.com
**Sent:**    Monday, October 15, 2007 5:30 PM
**To:**      Wells, Stewart H.
**Subject:** FW: Failed motor leads

Stewart--see answers to your questions below.
-Gerard

---

**From:** Garibaldi, Adan [EMC/MOTORES]
**Sent:** Thursday, October 11, 2007 8:13 AM
**To:** Stoner, Gerard [EMC/STL]
**Cc:** Bryan, Jim [EMC/STL]; Albers, Tim [EMC/STL]; Cation, Ken [EMC/STL]
**Subject:** RE: Failed motor leads

Gerard,
See my comments below.

---

**From:** Wells, Stewart H. [mailto:stewart.wells@otis.com]
**Sent:** Jueves, 11 de Octubre de 2007 07:31 a.m.
**To:** Stoner, Gerard [EMC/STL]
**Cc:** Bryan, Jim [EMC/STL]; Albers, Tim [EMC/STL]; Cation, Ken [EMC/STL]; Garibaldi, Adan [EMC/MOTORES];
Royal, Tyrus; Delgadillo, Ramon; McClement, Art
**Subject:** RE: Failed motor leads

Gerard,

Can you confirm the wire you are using on the motors shipped today?
EXAR 150.
Can you provide us with the dates you went back to Exar 150
October 1st 2006.
Can you provide a more specific date to the sub-standard wire usage?
September 1st, 2004 to September 30th, 2006.

Stewart Wells
812-331-5703

---

**From:** Gerard.Stoner@emotors.com [mailto:Gerard.Stoner@emotors.com]
**Sent:** Wednesday, October 10, 2007 12:08 PM
**To:** Wells, Stewart H.
**Cc:** Jim.Bryan@emotors.com; Tim.Albers@emotors.com; Ken.Cation@emotors.com;
Adan.Garibaldi@emotors.com
**Subject:** RE: Failed motor leads

Stewart,

12/19/2007

**EXHIBIT B**

OTIS-EM 00005

RE: Failed motor leads

Please see the information below from our Quality Manager. I apologize for the delay. I thought this had been communicated already through other individuals.
-Gerard

---

**From:** Garibaldi, Adan [EMC/MOTORES]
**Sent:** Thursday, September 20, 2007 9:39 AM
**To:** Stoner, Gerard [EMC/STL]
**Cc:** Bryan, Jim [EMC/STL]; Albers, Tim [EMC/STL]; Cation, Ken [EMC/STL]
**Subject:** FW: Failed motor leads

Gerard, please respond to Stewart.

We did not change the wire type, the supplier substituted an 'equivalent' wire (Exar SFX) since September 2004 to September 2006. We are not sure if all the wire supplied during that time was SFX or if it was a mix.
Thanks,
Adan.

Emerson Confidential,
This e-mail message may contain privileged or confidential information. If you are not the intended recipient, you may not disclose, use, disseminate, distribute, copy or rely upon this message or attachment in any way. If you received this e-mail message in error, please return by forwarding the message and its attachments to the sender.

---

**From:** Wells, Stewart H. [mailto:]
**Sent:** Martes, 18 de Septiembre de 2007 10:35 a.m.
**To:** Garibaldi, Adan [EMC/MOTORES]
**Cc:** Deo, Dana; Royal, Tyrus; McClement, Art; Delgadillo, Ramon; Lindemann, Sue [EMC/STL]; Chicoine, Troy; Waldschmidt, George; Hermesdorf, Jesualdo
**Subject:** RE: Failed motor leads

Adan,

Can you provide information on when **(Date)** US motors changed the wire type?

I noticed on some earlier motors the wire type was **Exar 150.**

The motors received now have a wire type of **Exar SFX**

Stewart Wells
812-331-5703

-----Original Message-----
From: Hermesdorf, Jesualdo [mailto:JesualdoH@otis.com]
Sent: Friday, September 07, 2007 7:01 PM
To: Wells, Stewart H.; Adan.Garibaldi@emotors.com
Cc: Pedro.Villanueva@emotors.com; oralia.chavez@emotors.com; Deo, Dana; Espinoza, Ricardo; Parra, Armando; Royal, Tyrus; McClement, Art; Delgadillo, Ramon; Sue.Lindemann1@emotors.com; Chicoine, Troy; Waldschmidt, George; Mangum, Tully D; Perez, Esteban; Castro, Gregorio A

Subject: RE: Failed motor leads

12/19/2007

OTIS-EM 00006

Adan,

     Please share the results of the analisys?

Saludos, Jesualdo.
520-620-4565.

-----Original Message-----
From: Wells, Stewart H.
Sent: Friday, August 24, 2007 5:25 AM
To: Adan.Garibaldi@emotors.com
Cc: Pedro.Villanueva@emotors.com; oralia.chavez@emotors.com; Deo, Dana; Hermesdorf, Jesualdo; Espinoza, Ricardo; Parra, Armando; Royal, Tyrus; McClement, Art; Delgadillo, Ramon; Sue.Lindemann1@emotors.com; Chicoine, Troy; Waldschmidt, George; Mangum, Tully D

Subject: RE: Failed motor leads

Adan,

Have you received the motor with the failed leads?

Attached is the delivery receipt

Stewart Wells
812-331-5703

-----Original Message-----
From: Adan.Garibaldi@emotors.com [mailto:Adan.Garibaldi@emotors.com]
Sent: Tuesday, August 21, 2007 11:04 AM
To: stewart.wells@otis.com; EricS.Belio@otis.com
Cc: Pedro.Villanueva@emotors.com; oralia.chavez@emotors.com
Subject: RE: Failed motor leads

I have not received this motor yet.
Do you have the model number and tracking number?
Regards.

-----Original Message-----
From: Wells, Stewart H. [mailto:stewart.wells@otis.com]
Sent: Viernes, 10 de Agosto de 2007 08:32 a.m.
To: Belio, Eric S
Cc: Deo, Dana; Hermesdorf, Jesualdo; Espinoza, Ricardo; Parra, Armando; Royal, Tyrus; McClement, Art; Villanueva, Pedro [EMC/MOTORES]; Garibaldi, Adan [EMC/MOTORES]; Delgadillo, Ramon; Beach, Richard [EMC/AZ]; Villanueva, Pedro [EMC/MOTORES]; Lindemann, Sue [EMC/STL]

Subject: RE: Failed motor leads
Importance: High

Eric,

Please send the motor to the address below:

12/19/2007

OTIS-EM 00007

RE: Failed motor leads

USEM DE MEXICO, SA.
C/O ZUNIGA LOGISTICS
12013 Sara Road Killam Ind. Park
78046  Laredo, TX
Phone: (956) 723 6311
Attn: Pedro Villanueva

Thank you for your help
Stewart Wells
812-331-5703

-----Original Message-----
From: Adan.Garibaldi@emotors.com [mailto:Adan.Garibaldi@emotors.com]
Sent: Thursday, August 09, 2007 6:54 PM
To: Ramon.Delgadillo@otis.com; Richard.Beach@emotors.com; Pedro.Villanueva@emotors.com;
Sue.Lindemann1@emotors.com
Cc: Dana.Deo@otis.com; JesualdoH@otis.com; Ricardo.Espinoza@otis.com; Armando.Parra@otis.com;
Tyrus.Royal@otis.com; art.mcclement@otis.com; stewart.wells@otis.com; Pedro.Villanueva@emotors.com

Subject: RE: Failed motor leads

Please send the motor as follows:

USEM DE MEXICO, SA.
C/O ZUNIGA LOGISTICS
12013 Sara Road Killam Ind. Park
78046  Laredo, TX
Phone: (956) 723 6311
Attn: Pedro Villanueva

Please use Conway Collect.
Other freight,. Prepaid.

-----Original Message-----
From: Delgadillo, Ramon [mailto:Ramon.Delgadillo@otis.com]
Sent: Jueves, 09 de Agosto de 2007 03:29 p.m.
To: Beach, Richard [EMC/AZ]; Villanueva, Pedro [EMC/MOTORES]; Garibaldi,
Adan [EMC/MOTORES]; Lindemann, Sue [EMC/STL]
Cc: Deo, Dana; Hermesdorf, Jesualdo; Espinoza, Ricardo; Parra, Armando;
Royal, Tyrus; McClement, Art; Wells, Stewart H.
Subject: RE: Failed motor leads

Richard / Sue:

This is a critical problem, where should we sent the defective motor for
immediate analysis? We need to receive a detailed report on this failure;
assuming your cable supplier provided with a defective product, would you
like to have portions of the wiring sent to it?  Can you test the material

12/19/2007

RE: Failed motor leads                                                                   Page 5 of 5

you have available in your factory to verify compliance with the stated
ratings? Your prompt reply is appreciated.

    Regards

OTIS Elevator - NSAA
Ramón Delgadillo G.
Contract Manager
Ph (520) 620 4416


> _____
> From:    Wells, Stewart H.
> Sent: Thursday, August 09, 2007 1:15 PM
> To:  richard.beach@emotors.com; Pedro.Villanueva@emotors.com;
> Adan.Garibaldi@emotors.com; Sue.Lindemann1@emotors.com
> Cc:   Delgadillo, Ramon; Deo, Dana; Hermesdorf, Jesualdo; Espinoza,
> Ricardo; Parra, Armando; Royal, Tyrus; McClement, Art
> Subject:    Failed motor leads
> Importance:  High
>
> All,
>
> Attached are pictures of a Submersible, US Motor, that experienced
> motor lead failure. Included in the pictures are readings of the oil
> temperature.  I am trying to locate the motor and have sent to your
> for evaluation.  This is potentially a troubling issue.
>
> I would like to have US Motors provide more information into the cause
> for the wires of a submersible motor to  degrade when submerged in oil.
>
>  << File: Motor Wires 2.JPG >>  << File: Motor Wires 3.JPG >>  << File:
> Motor Wires 4.JPG >>  << File: Motor Wires 5.JPG >>  << File: Room
> Temp.JPG >>  << File: Tank Temp.JPG >>  << File: Tank.JPG >>  << File:
> Wire Temp Rating.JPG >>  << File: Damaged Motor .JPG >>  << File:
> Motor Wires 1.JPG >>
>
>
> Stewart Wells
> Staff Electronic Engineer
> North American Operations
> Otis Elevator Company
> 1331 So. Curry Pike
> Bloomington, Indiana 47403
> Tel) 812-331-5703
> stewart.wells@otis.com
>

12/19/2007


**EMERSON.**
Motor Technologies

September 6, 2007

Mr. Stewart Wells
Otis Elevator Company
1331 South Curry Pike
Bloomington, IN 47403

Dear Stewart:

We have received the two submersible elevator motors returned for analysis, one from your group and another through your Service Center in Bloomfield.  Here is our report:

Issue
Lead wire insulation deterioration.

Root Cause
Motor operating above 50°C ambient, based on reports of 55 and 58°C. The lead insulation is temperature sensitive. Leads exposed to more than 50°C and submerged, in oil are subject to insulation expansion.
Motors are designed for 50°C ambient.

Actions

1.  Based on testing, motors operated in less than 50C ambient will operate satisfactorily
2.  If you expect the ambient to exceed the design ambient we would need to review the motor for redesign to include the electrical and mechanical design, the overload and the connection package.

Conclusion
We feel confident in the Emerson Elevator Motor operation within the design parameters. We understand that of the large population of motors in service only two have failed. This would support our feeling that the design is adequate for the application
If you have any question we would be available to set up a conference call.

Regards,

Adan Garibaldi
Emerson Motor Company

Emerson Motor Company                    9/6/07

**EXHIBIT C**

EXAR 150 LEAD WIRE

D 392021 A ALT.

| VOLTAGE | SIZE AWG. | NOM. INSUL. THKNESS | STRANDING | NOM. O.D. | USEM PART NO. | MFR'S PART NO. | CSA | U/L STYLE |
|---|---|---|---|---|---|---|---|---|
| 0 - 600V U/L 150 C° | 18 | .030 | 16 X 30 | .106 | 388160 | 25-00918 | | |
| | 16 | .030 | 26 X 30 | .118 | 388161 | 25-00916 | | |
| | 14 | .030 | 41 X 30 | .132 | 388162 | 25-00914 | | |
| | 12 | .030 | 65 X 30 | .149 | 388163 | 25-00912 | | |
| | 10 | .030 | 65 X 28 | .171 | 388164 | 25-00910 | | |
| | 8 | .045 | 84 X 27 | .237 | 388165 | 25-00908 | | |
| | 6 | .060 | 84 X 25 | .303 | 388166 | 25-00906 | | |
| | 4 | .060 | 133 X 25 | .383 | 388167 | 25-00904 | CL1251 | 3271 |
| | 2 | .060 | 259 X 26 | .443 | 388168 | 25-00902 | CL1503 | 3289 |
| | 1 | .080 | 259 X 25 | .532 | 388169 | 25-00901 | | |
| | 1/0 | .080 | 259 X 24 | .584 | 388170 | 25-00990 | | |
| | 2/0 | .080 | 259 X 23 | .625 | 388171 | 25-00900 | | |
| | 3/0 | .080 | 259 X 22 | .630 | 388172 | 25-00929 | | |
| | 4/0 | .080 | 259 X 21 | .746 | 388173 | 25-00940 | | |

APPROVED SOURCE: CHAMPLAIN CABLE CORP.

NOTE: DO NOT DELETE OBSOLETE PART NUMBERS FROM DRAWING. ANY PROPOSED SUBSTITUTION MUST BE SUBMITTED TO THE ENGINEERING DEPARTMENT FOR APPROVAL.

"EXAR" MUST BE MARKED WITH U/L AND CSA APPROVAL NUMBERS.

ALL DIMENSIONS ARE IN INCHES.

| ALT. LETTER | CHANGE NOTICE NO. | DESCRIPTION OF CHANGE |
|---|---|---|
| - | MOD | 02-APR-91 |
| A | 43761 | STD |
| B | 43898 | |
| C | 39905-79 | |
| D | 44633 | |

U.S. ELECTRICAL MOTORS
DIVISION OF EMERSON ELECTRIC CO.
ST. LOUIS, MISSOURI

| SCALE NONE | UNITS IN | | TITLE |
|---|---|---|---|
| MATERIAL --- | | | WIRE, MOTOR LEAD (TABULAR DRAWING) (CLASS H) |

DRAWN 20-DEC-90, TW
RVSD 4-JUL-96, MXERO
APPD 4-JUL-96, JVN

CSTG# PART ---

PREFIX 1 1 1NF    ALT. D 392021 A

FRAME ALL    TYPE [MH

SHEET 1 of

EXHIBIT D

OTIS-EM 00011

1 of 1