WGB/lmm/Doc#1907555                                                    4623-08006

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| OTIS ELEVATOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:08-cv-01107 |
| | ) | |
| EMERSON ELECTRIC CO. d/b/a | ) | Judge Ronald A. Guzman |
| U. S. ELECTRICAL MOTORS, INC., | ) | Magistrate Judge Sidney I. Schenkier |
| | ) | |
| Defendant. | ) | |

**ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT**

NOW COMES the defendant, Emerson Electric Co., sued herein as Emerson Electric Company dba U.S. Electrical Motors, Inc., by and through its attorneys, John W. Bell and William G. Beatty; Johnson & Bell Ltd., of counsel, and for its Answer and Affirmative Defenses to the Complaint heretofore filed by the plaintiff, here states as follows:

**NATURE OF THE CASE**

1.     This is an action for recovery of damages resulting from defective submersible elevator motors marked, sold and supplied to Otis by Emerson and Champlain.

**ANSWER:**

Defendant Emerson admits only to the nature of the plaintiff's case in that it involves allegedly defective submersible elevator motors that are claimed to have been marketed, sold and supplied by Emerson, with said defendant denying any and all liability to the plaintiff.

**PARTIES**

2.     Plaintiff Otis is a New Jersey corporation with its principal place of business located in Farmington, Connecticut.

**ANSWER:**

Upon information and belief, defendant Emerson admits the allegations set forth in paragraph 2.

3.    Defendant Emerson is a corporation organized and existing under the laws of the State of Missouri, maintaining its principal place of business at 8000 West Florissant Avenue, P.O. Box 4100, St. Louis, Missouri, 63136.

**ANSWER:**

Defendant Emerson admits the allegations set forth in paragraph 3.

4.    Defendant Champlain is a corporation organized and existing under the laws of the State of Delaware, maintaining its principal place of business at 175 Hercules Drive, Colchester, Vermont 05446.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 4.

**JURISDICTION AND VENUE**

5.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), as there exists complete diversity of citizenship between the parties, and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

**ANSWER:**

Defendant Emerson admits the allegations set forth in paragraph 5 as to the Court's subject matter jurisdiction in this case.

6.    Venue is proper in the United States District Court for the Northern District of Illinois, Eastern Division pursuant 29 U.S.C. § 1391(a) because a substantial part of the events

giving rise to Otis' claim occurred in this District, and specifically in the counties of Lake, Cook and DuPage.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 6, insofar as it has yet to determine whether a substantial part of the events giving rise to plaintiff's claims occurred within this judicial district.

## BACKGROUND

7.    Otis is in the business of manufacturing, installing and maintaining elevators, escalators, moving walkways and other people moving systems.

**ANSWER:**

Upon information and belief, defendant Emerson admits the allegations set forth in paragraph 7.

8.    Defendant Emerson is in the business of designing and manufacturing electrical motors and controls.  Emerson operates several electrical motors divisions, one of which is U.S. Electric Motors, Inc. ("USEM").

**ANSWER:**

Defendant Emerson states that Emerson Motor Company, a division of Emerson Electric Co., is in the business of designing and manufacturing certain electric motors and controls.

9.    Defendant Champlain is a copy in the business of manufacturing, designing and supplying wire and cable.

**ANSWER:**

Upon information and belief, defendant Emerson admits the allegations set forth in paragraph 9.

10.     For over 20 years Otis has used Emerson's motors to power its hydraulic elevator systems.   Emerson also supplies after market replacement motors for hydraulic elevators maintained and modernized by Otis.

**ANSWER:**

Upon information and belief, defendant Emerson admits the allegations set forth in paragraph 10.

11.     The Emerson motors is submersed in the hydraulic oil of the elevator's tank.   It functions by providing torque which powers a hydraulic pump.

**ANSWER:**

Upon information and belief, defendant Emerson admits the allegations set forth in paragraph 11.

12.     A hydraulic elevator cannot function without a fully operable, defect-free submersible motor.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 12.

13.     The contract specifications agreed to by Otis and Emerson, and memorialized in Otis drawing No. 6333DD, dated 99-04-07, require Emerson to produce motors capable of operating without malfunction while fully submersed in oil.

**ANSWER:**

Defendant Emerson denies plaintiff's characterization of Otis Drawing No. 6333DD as it relates to the purported duties of Emerson concerning the subject submersible elevator motors.

14.    The contract specifications also require Emerson to equip each motor with a "normally closed" automatic Motor Thermal Contact ("MTC") switch which temporarily removes electrical power to the motor when oil temperature exceeds 70°C. The MTC is designed to deactivate, and restore electrical power to the motor, once oil temperature drops below 70°C.

**ANSWER:**

Defendant Emerson admits only that the subject submersible elevator motors that it sold to Otis were equipped with certain thermal limit switches, but denies plaintiff's characterization of how said limit switches were intended to operate.

15.    Otis purchases motors from Emerson by issuing purchase orders. Each such purchase order incorporates by express reference a series of terms and conditions specifically identified by Otis on its "Form 3406." A copy of Form 3406 is attached as Exhibit A and incorporated herein. Emerson's motors range in price from approximately $260.00 to $390.00, depending on each motor's rated horsepower.

**ANSWER:**

Defendant Emerson admits only that Otis purchased motors from Emerson using purchase orders, but denies the remaining allegations set forth in paragraph 15 as they purportedly apply to all purchase orders issued by Otis to Emerson. Further answering, Emerson admits to the approximate price range stated in paragraph 15 relative to the subject motors.

16.    Form 3406, incorporated by reference into each and every one of Otis' purchase orders to Emerson, provides:

In addition to any warranty implied by fact or law, Seller expressly warrants all items and/or services will be free from defects in design, manufacture, workmanship and materials, and will conform strictly to applicable specifications, drawings, and approved samples, if any, and to be fit and sufficient for the

purpose intended and to be merchantable. Such warranties, together with all other service warranties of Seller, shall run to Buyer, its successors, assigns and customers.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 16 as to plaintiff's allegations that the terms and conditions set forth in Form 3406 are allegedly incorporated by reference into each and every one of Otis' purchase orders to Emerson.

17.    A portion of the motors Otis purchases from Emerson are shipped from Emerson's Monterrey, Mexico production facility to the Otis Service Center ("OSC") in Bloomfield, Connecticut. The motors are stored and maintained at OSC until they are shipped to buildings throughout the country where they are installed in hydraulic elevators.

**ANSWER:**

Defendant Emerson admits only that a portion of the motors Otis purchased from Emerson were shipped from Emerson's Monterrey, Mexico production facility to Otis' service center, but is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 17.

18.    Emerson also ships motors from its Mexico-based plant directly to Otis' Nogales, Mexico manufacturing facility. There, Emerson's motors are installed in Otis' LVM model hydraulic elevators and subsequently shipped to any Otis job site across the United States.

**ANSWER:**

Defendant Emerson admits only that it shipped certain motors from its Mexico-based facility to Otis' Nogales, Mexico manufacturing facility, but is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 18.

19.    During all relevant time periods, Champlain supplied Emerson with wire for its submersible motors.    Champlain's wire connects the submersible motor to a stand-alone controller which provides the requisite electrical power to enable the motor to function.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 19 as to who supplied Emerson with wire for the subject submersible elevator motors, but admits that wire produced by Champlain was used to connect the subject motors to controllers which provided electrical power to the motors.

20.    Champlain holds itself out to the public as a supplier capable of producing "premium heat defying cable" that is particularly well suited for industrial applications such as submersible hydraulic elevator motors.

**ANSWER:**

Defendant Emerson makes no answer to the allegations set forth in paragraph 20 insofar as said allegations are not directed against this defendant.

21.    Champlain's wiring is coated with a polymeric insulation material designed to resist swelling, deterioration and degradation and to protect the underlying conductive metal wiring.  Champlain advertises that its insulated wiring is tested and specifically rated to perform, without defect or malfunction, when exposed to a variety of chemical contaminants including engine oil.

**ANSWER:**

Defendant Emerson makes no answer to the allegations set forth in paragraph 21 insofar as said allegations are not directed against this defendant.  To the extent or degree that the allegations set forth in paragraph 21 are deemed or construed to be directed against this

defendant, Emerson is without knowledge or information sufficient to form a belief as to the truth of the plaintiff's allegations as set forth in paragraph 21 as they relate or pertain to all of the wiring produced by Champlain.

22.    At all times pertinent, Champlain was aware that its polymeric insulated wire was utilized as a component in submersible motors sold by Emerson to Otis.

**ANSWER:**

Defendant Emerson makes no answer to the allegations set forth in paragraph 22 insofar as said allegations are not directed against this defendant.   To the extent or degree that the allegations set forth in paragraph 22 are deemed or construed to be directed against this defendant, Emerson is without knowledge or information sufficient to form a belief as to that which Champlain was allegedly aware.

<u>**ANSWERS TO ALLEGATIONS COMMON TO ALL COUNTS**</u>

23.    Otis restates, reavers and realleges Paragraphs 1 through 22 of its Complaint as the same are set forth in Paragraphs 1 through 22 herein.

**ANSWER:**

Defendant Emerson repeats and realleges its answers to paragraphs 1 through 22 as its answer to paragraph 23 as though fully set forth herein.

24.    In 2004, Otis issued a purchase order, covering a series of Emerson submersible elevator motors.   This purchase order expressly referenced and incorporated the terms and conditions of Form 3406, and the Otis-Emerson agreed upon contract specifications, as memorialized in Otis drawing No. 6333DD.  Emerson shipped the motors from its Monterrey, Mexico production facility to OSC, in exchange for Otis' payment of the full purchase order amount.

- 8 -

**ANSWER:**

Defendant Emerson admits only that Otis issued one or more purchase orders regarding the purchase of a series of Emerson submersible motors, and that certain motors were shipped from Emerson's production facility in Monterrey, Mexico, but denies the remaining allegations set forth in paragraph 24.

25.     OSC shipped one of the Emerson motors covered by the purchase order referenced in the preceding paragraph to Otis' field office in Lombard, Illinois, to be installed as a replacement motor in Westinghouse hydraulic elevator identified as Machine No. D63953, located at the Washington Mutual building in Vernon Hills, in Lake County, Illinois.   The Emerson motor contains a data plate which according to information provided by Emerson indicates a manufacture date of March 2004.   An Otis field mechanic installed the Emerson motor and returned machine No. D63953 to normal operation.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 25.

26.     On February 27, 2006, an Otis field mechanic performing a routine elevator inspection of machine No. D63953 at the Washington Mutual building discovered that the elevator had apparently lost all power and was not functioning.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 26.

27.     Upon further inspection on February 27, 2006, the mechanic observed that the Emerson motor had unexpectedly short-circuited and lost power.   Subsequent investigation

revealed that the polymeric insulation coating the Champlain wire submersed in the elevator's hydraulic oil tank had swelled, deteriorated and degraded and had separated from the underlying conductive metal wiring. Otis' field mechanics discerned that the elevator apparently shut down because the conductive wiring became exposed, made contact with a metal object inside the elevator's hydraulic oil tank, and short-circuited the motor.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 27.

28.    The failed wiring rendered the motor totally inoperable.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 28, but further answering, denies any and all liability for the allegedly failed wire.

29.    Due to the failure of the motor, Machine No. D63953 was rendered totally inoperable and Otis was forced to replace the motor in order to restore normal elevator function.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 29, but further answering, denies any and all liability for the alleged failure of the motor in question.

30.    Otis promptly notified Emerson of the Washington Mutual motor failure. At the specific request of representatives of Emerson, Otis sent the failed motor to Emerson's manufacturing facility in Monterrey, Mexico on or about March 26, 2006.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 30.

31.     Representatives of Otis repeatedly contacted Emerson seeking information pertaining to the reasons for the apparent wiring and motor failure, requesting a root cause analysis, and urging Emerson to investigate further.

**ANSWER:**

Defendant Emerson admits only that it was contacted by representatives of Otis seeking information as to the alleged condition of the wiring of the subject motor, but denies the remaining allegations set forth in paragraph 31.

32.     Emerson failed to respond to Otis' many requests, failed to provide a replacement product, and eventually conceded to Otis that the defective motor removed from the Washington Mutual building had been lost, misplaced, discarded or destroyed.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 32.

33.     In March of 2007, a second Emerson submersible motor installed at another Washington Mutual elevator in Vernon Hills, also failed.  Otis' investigation again revealed similar evidence of degradation and deterioration of the polymeric insulation coating the motor's wiring.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 33, but further answering, denies any and all liability for the alleged failure of the motor in question.

34.    Otis also found evidence of Emerson motor wiring insulation deterioration in April of 2007 at an Otis LVM hydraulic elevator located at the St. Alexius Medical Office building in Hoffman Estates, in Cook County, Illinois; in May of 2007 at an Otis LVM hydraulic unit at Cook Street Plaza in Barrington, in Lake County, Illinois; in June of 2007 at an Otis LVM hydraulic elevator located at Hampton Inn in Bolingbrook, in DuPage County, Illinois, and finally in November of 2007 at an Otis hydraulic elevator at the Courtyard by Marriott in Schaumburg, in Cook County, Illinois.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 34, but further answering, denies any and all liability for the alleged failures of the motors in question.

35.    In each of the instances set forth in the preceding paragraph, Otis field mechanics observed that the polymeric insulation coating the wires of Emerson's motors exhibited swelling, degradation and deterioration.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 35, but further answering, denies any and all liability for the purported motor failures allegedly experienced by Otis or its customer.

36.    Otis restates, reavers and realleges Paragraphs 1 through 36 of its Complaint as the same are set forth in Paragraphs 1 through 36 herein.

**ANSWER:**

Defendant Emerson repeats and realleges its answers to paragraphs 1 through 35 as its answer to paragraph 36 as though fully set forth herein.

37.    In early 2006, through a purchase order issued pursuant to the terms and conditions of Form 3406, Emerson supplied Otis with a series of 50 horsepower motors to be incorporated into new Otis LVM hydraulic elevators for assembly at Otis' Nogales, Mexico plant.  One of the motors, manufactured by Emerson in June of 2006 at its Monterrey, Mexico plant was installed into Otis LVM Machine No. 482994.

**ANSWER:**

Defendant Emerson admits only that in 2006, it supplied Otis with certain motors to be used in hydraulic elevators produced by Otis, but denies that said purchases were made pursuant to the terms and conditions of Form 3406.  Further answering, this defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 37.

38.    Machine No. 482994 was installed on or about May 1, 2007 at the Intuit building, 7555 Torrey Santa Fe Road in San Diego, California, 92129.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 38.

39.    On or about August 9, 2007, during a routine field examination, an Otis mechanic discovered that machine No. 482994 lost power.  Upon inspection, the mechanic determined that the Emerson motor short-circuited; the polymeric insulation of the motor's wiring had deteriorated to such a degree that it exposed the underlying conductive wire to an interior metal wall of the machine's hydraulic oil tank.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 39, but denies any and all liability for the condition of the motor complained of.

40.    The deteriorated wiring insulation rendered the motor fully inoperable and Otis was forced to replace it in its entirety.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 40, but denies any and all liability for the condition of the motor complained of.

41.    Subsequent to the Illinois and California Emerson motor failures, Otis launched a nationwide inspection of motors supplied by Emerson since 2004. That inspection revealed frequent and widespread evidence of wire insulation deterioration and degradation.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 41, but denies any and all liability for the condition of the motors complained of.

42.    In an e-mail dated October 11, 2007, Emerson revealed to Otis for the first time that Champlain had provided "sub-standard wire" during the time period of September 1, 2004 through September 30, 2006. <u>See</u> true and accurate copy of October 11, 2007 e-mail attached as Exhibit B.

**ANSWER:**

Defendant Emerson admits only that on or about October 11, 2007, it advised Otis that unbeknownst to Emerson, the wire supplier, EIS, Inc., had substituted a different wire for the wire called out in Emerson's purchase orders and in the drawings and specifications referenced therein, during the period of time between September 1, 2004 and September 30, 2006, but denies the remaining allegations set forth in paragraph 42.

43.    According to Emerson, Champlain temporarily supplied its "Exar SFX" brand insulated wire instead of the "Exar 150" brand Emerson's contract specifications require.

**ANSWER:**

Defendant Emerson admits only that the wire supplier, EIS, Inc., temporarily substituted one brand of wire for another brand of wire that had been called out in Emerson's specification for the motor leads.

44.    The "Exar 150" brand had been used without incident or malfunction for decades in motors supplied to Otis by Emerson and to Otis' knowledge never exhibited signs of swelling, deterioration or degradation.

**ANSWER:**

Defendant Emerson admits only that the Exar 150 brand wire had been used in certain motors supplied by Emerson to Otis without incident or malfunction, but is without knowledge or information sufficient to form a belief as to Otis' knowledge regarding the performance of said wire.

45.    This wiring change was made by Champlain without the knowledge, consent or authority of Otis.

**ANSWER:**

Defendant Emerson denies that the purported wiring change was made by Champlain, and therefore denies the allegations set forth in paragraph 45. Further answering, defendant Emerson states that the wiring change was made by EIS, Inc.

46.    According to information supplied to Otis by Emerson, this substandard wiring change was also made without the approval, consent, or even knowledge of Emerson.

**ANSWER:**

Defendant Emerson admits only that the substitution of the wire by the wire supplier, EIS, Inc., was done without the approval, consent or knowledge or Emerson, but denies the remaining allegations set forth in paragraph 46.

47.    Otis' investigation further revealed that the polymeric insulation of "Exar SFX" wire is of inadequate composition for use in hydraulic elevators and is highly susceptible to swelling, deterioration and degradation when submersed in oil.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth or the allegations set forth in paragraph 47 concerning the alleged results of Otis' investigation.

48.    Emerson also revealed to Otis in a September 6, 2007 letter that these motors were incapable of operating up to the MTC trigger temperature of 70°C, and instead are only designed to operate below 50°C. See true and accurate copy of September 6, 2007 letter attached as Exhibit C.

**ANSWER:**

Defendant Emerson denies the characterization of the information set forth in Exhibit C to the plaintiff's Complaint, as described in paragraph 48 of the Complaint. Further answering, this defendant admits only that it advised Otis that the root cause of the failures allegedly experienced in the subject motors was their operation in environments having temperatures above the rated capacities of the subject motors.

49.     In the several decades that preceded the sale of the substandard wiring, the Emerson motors Otis installed in hydraulic elevators routinely and regularly operated at temperatures up to and beyond 70°C, without incident, malfunction or defect.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 49, but if said allegations are true, Otis exceeded the rated thermal capacity for the motors in question.

50.     During the time period of 2004 through 2006, Otis purchased in excess of 10,000 submersible motors from Emerson.

**ANSWER:**

Defendant Emerson is without knowledge as to the exact number of motors it has sold to Otis during the 2004-2006 timeframe, but further answering, admits to the sale of a substantial quantity of electric motors to Otis during the time period in question.

**COUNT ONE**
**BREACH OF EXPRESS WARRANTY**

51.     Otis restates, reavers and realleges Paragraphs 1 through 51 of its Complaint as the same are set forth in Paragraphs 1 through 51 herein.

**ANSWER:**

Defendant Emerson repeats and realleges its answers to paragraphs 1 through 50 as its answer to paragraph 51 of Count One as though fully set forth herein.

52.    During the approximate time period of 2004 through 2006, through the issuance of purchase orders, Emerson sold and delivered to Otis in excess of 10,000 submersible elevator motors for a total purchase price approximating $3,000,000. This sum was paid in full by Otis to Emerson.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 52 insofar as it has not compiled a total number of motors sold to Otis, nor calculated the approximate purchase/sale price of said motors.

53.    At the time of each sale over the course of this period, Otis relied on representation that Emerson's motors would be free from defects in design, manufacture, workmanship and materials and would conform strictly to the contract terms the parties agreed to, pursuant to Form 3406, and to all specifications, including Otis drawing No. 6333DD.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to Otis' allegations of reliance, and specifically denies its alleged duty to conform to the form, drawings and specifications referenced in paragraph 53.

54.    At the time of sale and as part of each and every sale, Emerson warranted to Otis that its motors were:

> free from such defects in design, manufacture, workmanship and material, and
> (that they would) conform strictly to applicable specifications, drawings . . . . <u>See</u>
> Form 3406, Exhibit A.

**ANSWER:**

Defendant Emerson denies its alleged obligation to conform to the terms of Form 3406, as is alleged in paragraph 54.

54.    In purchasing the motors described in this Complaint, Otis relied on the express warranties as represented by Emerson, and on those affirmations repeatedly given to Otis during the course of the parties' 20+ year relationship.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the plaintiff's allegations set forth in paragraph 55 regarding what Otis allegedly relied upon in purchasing the subject motors.

56.    Champlain, at all times pertinent, was aware that its polymeric insulated wire was utilized as a component in motors sold to Otis.  Champlain knew the tolerances and requirements for the hydraulic elevator tank application, and expressly warranted to Emerson that its insulated wire could be used in elevator motors.

**ANSWER:**

Defendant Emerson makes no answer to the allegations set forth in paragraph 56 to the extent that said allegations pertain to knowledge or awareness of certain matters on the part of Champlain.

57.    Otis was an intended third-party beneficiary of the express warranty between Emerson and Champlain.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 57 as constituting a conclusion of law rather than an averment of fact.

58.    Emerson and Champlain breached the express warranties described in this Complaint by supplying in excess of 10,000 submersible motors that do not conform to the parties' agreed-upon specifications.    Specifically, Emerson provided motors manufactured on and after 2004 which contained non-specified substandard Champlain wiring that is incapable of resisting hydraulic elevator oil, and is thus highly susceptible to severe polymeric insulation swell, deterioration and degradation.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 58 and specifically denies having committed a breach of any express warranties as to the subject elevator motors.

59.    Otis discovered this breach of warranty and immediately gave a written notice to Emerson of the breach, as set forth above.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 59 insofar as it denies having committed a breach of any warranties to Otis, express or otherwise.

60.    Pursuant to Chapter 810, Illinois General Compiled Statutes § 5/2-714, Otis is entitled to recover damages from Emerson and Champlain constituting the difference between the value of each Emerson motor it accepted and the value each would have had if it had been as warranted.    Damages are currently immeasurable, but capable of precise ascertainment at the time of trial, and approximate $3,000,000.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 60.

61.    Otis is also entitled to damages representing labor costs in performing any and all repairs and/or replacements to the defective motors provided by Emerson and Champlain, lost

profits, loss of use, loss of customer goodwill, and business interruption expenses in a total amount currently immeasurable but capable of precise ascertainment at the time of trial and approximate $10,000,000.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 61.

**COUNT TWO**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

62.    Otis restates, reavers and realleges Paragraphs 1 through 62 of its Complaint as the same are set forth in Paragraphs 1 through 62 herein.

**ANSWER:**

Defendant Emerson repeats and realleges its answers to paragraphs 1 through 61 as its answer to paragraph 62 of Count Two as though fully set forth herein.

63.    During a time period beginning in 2004, through the issuance of purchase orders, Emerson sold and delivered to Otis in excess of 10,000 submersible elevator motors for a total purchase price approximating $3,000,000.  This sum was paid in full by Otis to Emerson.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 63 insofar as it has not compiled a total number of motors sold to Otis, nor calculated the approximate purchase/sale price of said motors.

64.    The contracts of sale, purchase orders between Otis and Emerson, contained an implied warranty that the motors would be of merchantable quality.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 64 as constituting a conclusion of law rather than an averment of fact. Further answering, this defendant denies that an implied warranty of merchantability arose pursuant to the transactions in question.

65.    Champlain, at all times pertinent, was aware that its polymeric insulated wire was utilized as a component in motors sold to Otis. Champlain knew the tolerances and requirements for the hydraulic elevator tank application, and impliedly warranted to Emerson that its insulated wire was merchantable.

**ANSWER:**

Defendant Emerson makes no answer to the allegations set forth in paragraph 65 to the extent that said allegations pertain to knowledge or awareness of certain matters on the part of Champlain.

66.    Otis was an intended third-party beneficiary of the implied warranty of merchantability between Emerson and Champlain.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 66 as constituting a conclusion of law rather than an averment of fact.

67.    The motors provided by Emerson and Champlain are not merchantable because they are incapable of functioning properly in hydraulic elevator systems. The polymeric insulated wiring employed during the 2004 through 2006 "sub-standard" usage time period is highly susceptible to swelling, deterioration and degradation and is unable to properly resist hydraulic elevator oil.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 67.

68.    Otis discovered this breach of implied warranty and immediately gave written notice to Emerson in March of 2006.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 68 insofar as it denies committing any breach of implied warranty.

69.    Otis has attempted to use the Emerson motors in the manner and for the purpose for which they were intended yet the motors have systematically failed.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 69.

70.    Pursuant to Chapter 810, Illinois General Compiled Statutes § 5/2-714, Otis is entitled to recovery of damages from Emerson and Champlain constituting the difference between the value of each Emerson motor it accepted and the value each would have had if it had been as warranted. Damages are currently immeasurable, but capable of precise ascertainment at the time of trial, and approximate $3,000,000.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 70.

71.    Otis is also entitled to damages representing labor costs in performing any and all repairs and/or replacements to the defective motors provided by Emerson and Champlain, lost profits, loss of use, loss of customer goodwill, and business interruption expenses in a total amount currently immeasurable but capable of precise ascertainment at the time of trial and approximate $10,000,000.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 71.

**COUNT THREE**
**BREACH OF IMPLIED WARRANTY**
**OF FITNESS FOR PARTICULAR PURPOSE**

72.    Otis restates, reavers and realleges Paragraphs 1 through 72 of its Complaint as the same are set forth in Paragraphs 1 through 72 herein.

**ANSWER:**

Defendant Emerson repeats and realleges its answers to paragraphs 1 through 71 as its answer to paragraph 72 of Count Three as though fully set forth herein.

73.    During a time period beginning in 2004, through the issuance of purchase orders, Emerson sold and delivered to Otis in excess of 10,000 submersible elevator motors for a total purchase price approximating $3,000,000.  This sum was paid in full by Otis to Emerson.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 73 insofar as it has not compiled a total number of motors sold to Otis, nor calculated the approximate purchase/sale price of said motors.

74.    The contracts of sale, purchase orders between Otis and Emerson, contained an implied warranty that the motors would be fit for the particular purpose of providing electrical power to hydraulic elevator systems while submersed in hydraulic oil.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 74 insofar as it denies that an implied warranty of fitness for a particular purpose arose pursuant to the transactions in question.

75.     Emerson specifically markets its products as "Special Application Submersible Elevator Motors," and is therefore aware of the particular purpose for which these motors are required.

**ANSWER:**

Defendant Emerson admits only that it is aware of the intended use of its motors in hydraulic elevator applications per the specified operating conditions with regard to the submersible motors that it manufactures and markets.

76.     At all times pertinent, Emerson was aware that Otis was relying on its skill, judgment and technical expertise in designing and manufacturing submersible elevator motors fit for this particular purpose.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 76 and specifically denies that Otis relied upon the skill, judgment or expertise of Emerson in designing or manufacturing a motor that was fit for the particular purpose for which Otis placed said motors, as Otis did not provide end use technical information to Emerson for the motors it purcahsed.

77.     Champlain, at all times pertinent, was aware that its polymeric insulated wire was utilized as a component in motors sold to Otis. Champlain knew the tolerances and requirements for the hydraulic elevator tank application, and impliedly warranted to Emerson that its insulated wire was fit for this particular purpose.

**ANSWER:**

Defendant Emerson makes no answer to the allegations set forth in paragraph 77 insofar as said allegations are not directed against this defendant.

78.     Otis was an intended third-party beneficiary of the implied warranty of fitness for a particular purpose between Emerson and Champlain.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 78 as constituting a conclusion of law rather than an averment of fact.    To the extent or degree that the allegations set forth in paragraph 78 are deemed or construed to be directed against this defendant, Emerson is without knowledge or information sufficient to form a belief as to that which Champlain allegedly knew or was allegedly aware.

79.     Emerson's motors are not fit for this particular purpose because the composition of the polymeric insulation coating renders each motor's exterior wires highly susceptible to swelling, deterioration and degradation.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 79.

80.     Otis discovered this breach of implied warranty and immediately gave written notice to Emerson in March of 2006.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 80 insofar as this defendant denies committing any breach of any implied warranty.

81.     Otis has attempted to use the Emerson motors and Champlain's wiring in the manner and for the particular purposes for which they were intended yet the motors and wiring have systematically failed.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 81.

82.    Pursuant to Chapter 810, Illinois General Compiled Statutes § 5/2-714, Otis is entitled to recover damages from Emerson and Champlain constituting the difference between the value of each Emerson motor it accepted and the value each would have had if it had been as warranted.  Damages are currently immeasurable, but capable of precise ascertainment at the time of trial, and approximate $3,000,000.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 82.

83.    Otis is also entitled to damages representing labor costs in performing any and all repairs and/or replacements to the defective motors provided by Emerson and Champlain, lost profits, loss of use, loss of customer goodwill, and business interruption expenses in a total amount currently immeasurable but capable of precise ascertainment at the time of trial and approximate $10,000,000.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 83.

## COUNT FOUR
## NEGLIGENCE

84.    Otis restates, reavers and realleges Paragraphs 1 through 84 of its Complaint as the same are set forth in Paragraphs 1 through 84 herein.

**ANSWER:**

Defendant Emerson repeats and realleges its answers to paragraphs 1 through 83 as its answer to paragraph 84 of Count Four as though fully set forth herein.

85.    In March of 2006, after receiving notification from Otis that its submersible motor had failed, Emerson requested that Otis send the motor to its Monterrey, Mexico plant.

**ANSWER:**

Defendant Emerson admits only to a series of communications with Otis regarding an alleged failure of a submersible motor, but denies the remaining allegations set forth in paragraph 85.

86.    Otis urged Emerson to investigate and to immediately respond if that investigation revealed any defect in manufacture, design or otherwise that required corrective action.

**ANSWER:**

Defendant Emerson admits only that Otis asked it to investigate an alleged failure of a submersible motor, but denies the remaining allegations set forth in paragraph 86.

87.    Emerson voluntarily entered into an agreement whereby Otis would return the failed motor to Emerson in exchange for Emerson's assurance that it would conduct a thorough investigation and root cause analysis and fully disclose any and all results of that investigation and analysis to Otis.

**ANSWER:**

Defendant Emerson admits only that it undertook an investigation of an alleged motor failure at the request of Otis, which sent lead wires to Emerson, but denies the remaining allegations set forth in paragraph 87.

88.    In entering into this agreement in March of 2006 with Otis, Emerson reasonably understood that it voluntarily assumed a duty to take possession of the failed motor, and to properly maintain and preserve it; to fully disclose to Otis the results of any and all investigation and root cause analysis; and to assist in identifying and assessing the need for any remedial or corrective repair or replacement work.

- 28 -

**ANSWER:**

Defendant Emerson admits only that it undertook an investigation of an alleged motor failure at the request of Otis, which sent lead wires to Emerson, but denies the remaining allegations set forth in paragraph 88.

89.    In response to this request and in exchange for Emerson's assurance that it would fully disclose the results of any and all investigation, Otis sent Emerson the failed motor from the Washington Mutual Insurance building in Vernon Hills, Illinois on or about March 26, 2006.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 89, and further answering, states that Otis sent lead wires to Emerson rather than a motor, such lead wire remaining in Emerson's possession.

90.    Emerson failed to immediately notify Otis of any motor defect whatsoever, including the substandard Champlain wiring, thereby prompting Otis to continue purchasing Emerson's motors, and to continue installing these motors in new and existing hydraulic elevators throughout the United States.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 90.

91.    Emerson breached its agreement with Otis and breached the duty it voluntarily undertook to preserve this evidence by losing, misplacing, discarding or destroying the motor.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 91.

92.    The spoliation of this evidence also constitutes a breach of the voluntary duty Emerson undertook to fully investigate and promptly reveal any defect in the motors it continued

to sell. This breach directly and proximately caused damage in that Otis unknowingly continued purchasing and installing defective motors.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 92.

93.    Despite the duty it voluntarily undertook in March of 2006 to promptly notify Otis of any defect in its motors, Emerson did not inform Otis of the substandard Champlain wiring until October 11, 2007, seventeen months later. (See Exhibit B).

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 93.

94.    As set forth in Exhibit B, Champlain supplied substandard wiring until September 30, 2006. Emerson thus sold Otis several thousand defective motors after voluntarily undertaking this duty and breaching it by spoliating critical evidence.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 94.

95.    Otis is entitled to damages as a direct and proximate result of Emerson's breach of its duty in an amount currently immeasurable but capable of precise ascertainment at the time of trial and approximating $10,000,000, including but not limited to the costs of repair and/or replacement for all defective motors sold to Otis by Emerson.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 95.

## COUNT FIVE
## BREACH OF CONTRACT

96.     Otis restates, reavers and realleges Paragraphs 1 through 96 of its Complaint as the same are set forth in Paragraphs 1 through 96 herein.

**ANSWER:**

Defendant Emerson repeats and realleges its answers to paragraphs 1 through 95 as its answer to paragraph 96 of Count Five as though fully set forth herein.

97.     Champlain entered into a contract with Emerson whereby Champlain agreed to provide polymeric insulated wiring, marketed as "premium heat defying cable" for installation in Emerson's submersible electrical motors.

**ANSWER:**

Defendant Emerson admits only to a commercial relationship with Champlain and/or its distributor, EIS, Inc., wherein the latter would supply and provide wire, pursuant to Emerson's specifications, for use in Emerson's submersible electric motors.  Emerson denies the remaining allegations set forth in paragraph 97.

98.     Emerson specifically qualified Champlain as an "approved source" for the wiring to be incorporated into the electrical motors sold to Otis.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 98 insofar as the allegations set forth therein are unclear and not capable of being answered in the present form.

99.     Champlain, at all times pertinent, was aware that its polymeric insulated wire was utilized as a component in motors sold to Otis.  Champlain knew it was supplying product for subsequent sale to Otis, knew the tolerances and requirements for the hydraulic elevator tank application, and specifically marketed its insulated wire for use in elevator motors.

**ANSWER:**

Defendant Emerson makes no answer to the allegations set forth in paragraph 99 insofar as said allegations are not directed against this defendant.  To the extent or degree that the allegations set forth in paragraph 99 are deemed or construed to be directed against this defendant, Emerson is without knowledge or information sufficient to form a belief as to that which Champlain allegedly knew or was allegedly aware.

100.   Otis was an intended third-party beneficiary of the contract between Emerson and Champlain.

**ANSWER:**

Defendant Emerson makes no answer to the allegations set forth in paragraph 100 insofar as they constitute a legal conclusion rather than an averment of fact.

101.   The Emerson-Champlain contract incorporated specifications which expressly required Emerson's motors to contain "Exar 150" polymeric insulated wire.  These same specifications also obligated Champlain to submit for approval to Emerson's engineering division any proposed wiring substitution; "any proposed substitution must be submitted to the engineering department for approval."  See USEM Wire, Motor Lead Drawing No. 392021, attached as Exhibit D.

**ANSWER:**

Defendant Emerson admits only that Emerson specified the use of "Exar 150" for the lead wires of the subject motors, and further required that any proposed substitution of said wire be submitted to Emerson' engineering department for approval.

102.   During the time period of September 1, 2004 through September 30, 2006, Champlain supplied Emerson with substandard "Exar SFX" wire instead of the contract-

mandated "Exar 150" wiring. This wiring was incorporated into more than 10,000 submersible motors sold by Emerson to Otis.

**ANSWER:**

Defendant Emerson admits only that ongoing investigation has demonstrated that at some point during the period of September 1, 2004 through September 30, 2006, the wire supplier, EIS, Inc., substituted "Exar SFX" wire in place of "Exar 150" wire in violation of the specifications provided by Emerson.

103.    This wiring substitution was made without the knowledge, authority, consent or approval of Otis.

**ANSWER:**

Defendant Emerson is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 103, but further answering states that defendant Emerson did not authorize or consent to, nor did Emerson have knowledge of, the substitution of the wire.

104.    Upon information and belief, Champlain's wiring substitution was also not submitted to, nor approved by, Emerson.

**ANSWER:**

Defendant Emerson admits only that the substitution of the wire by the wire supplier, EIS, Inc., was not submitted to, nor approved by, Emerson.

105.    According to the express terms of the Emerson-Champlain contract, Champlain has materially breached its contract by substituting substandard polymeric insulation without Emerson's approval.

**ANSWER:**

Defendant Emerson makes no answer to the allegations set forth in paragraph 105 insofar as said allegations are not directed against this defendant.

106.    As a direct and proximate consequence of Champlain's material breach, Otis, an intended third-party beneficiary of the Emerson Champlain contract, has sustained damages.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 106.

107.    Otis's damages are currently immeasurable, but capable of precise ascertainment at the time of trial, including the cost to repair and/or replace each and every Emerson motor containing defective polymeric insulation wiring manufactured and supplied by Champlain.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 107 and specifically denies liability for the damages allegedly sustained by Otis.

108.    Otis is also entitled to damages representing labor costs in performing any and all repairs necessitated by Champlain's defective wiring, lost profits, loss of use, loss of customer goodwill, and business interruption expenses in a total amount currently immeasurable but capable of precise ascertainment at the time of trial and approximate $10,000,000.

**ANSWER:**

Defendant Emerson denies the allegations set forth in paragraph 108 and specifically denies liability for the damages allegedly sustained by Otis.

## COUNT SIX
## PRODUCT LIABILITY

109.    Otis restates, reavers and realleges Paragraphs 1 through 109 of its Complaint as the same are set forth in Paragraphs 1 through 109 herein.

110.    The wiring supplied by Champlain between the time period of 2004 through 2006, and incorporated into submersible elevator motors sold by Emerson to Otis was defective in design and/or manufacture.

111.    The "Exar SFX" wire is of inadequate composition for use in hydraulic elevators and is highly susceptible to swelling, deterioration and degradation when submersed in oil.

112.    The defective condition of Champlain's "Exar SFX" wire existed at the time the wiring left Champlain's control.

113.    As a direct and proximate cause of its sale of defective wiring, Champlain has caused damage to Otis.  Specifically, Champlain's polymeric insulation swells, deteriorates and degrades, subjecting more than 10,000 Emerson submersible motors sold to Otis to sudden failure.

114.    As a consequence of Champlain's defective wiring, Otis has, and will continue to be damaged in that the motors containing this substandard wire must be replaced in their entirety in order to avoid rendering all affected hydraulic elevators inoperable.  Damages for this replacement are currently immeasurable, but capable of precise ascertainment at the time of trial, and approximate $3,000,000.

115.    Otis is also entitled to damages representing labor costs in performing any and all repairs to Emerson's defective motors necessitated by Champlain's defective wiring, lost profits, loss of use, loss of customer goodwill, and business interruption expenses in a total amount currently immeasurable but capable of precise ascertainment at the time of trial and approximating $10,000,000.

**109 – 115 ANSWER:**

Defendant Emerson makes no answer to the allegations set forth in Count Six insofar as said allegations are not directed against this defendant. To the extent that any of the allegations set forth in Count Six are deemed to construed to be directed against this defendant, this defendant denies any and all such allegations as to liability and damages.

WHEREFORE, the defendant, Emerson Electric Co., sued herein as Emerson Electric Company dba U.S. Electrical Motors, Inc., denies that plaintiff, Otis Elevator Company, is entitled to an award of damages from this defendant in the amount sought in the plaintiff's Complaint, or in any sum or amount whatsoever, and prays for judgment in favor of this defendant and against plaintiff on plaintiff's Complaint.

**THIS DEFENDANT DEMANDS TRIAL BY JURY.**

**First Affirmative Defense (Counts One, Two, Three and Six --Misuse)**

NOW COMES the defendant, Emerson Electric Co., sued herein as Emerson Electric Company dba U.S. Electrical Motors, Inc., and, pleading in the alternative and without prejudice to the denials set forth above, states the following First Affirmative Defense, applicable to plaintiff's Counts One, Two, Three and Six.

1.    The specifications for the submerged Emerson elevator motors that are the subject of plaintiff's Complaint dictate that the product is to be operated in an ambient temperature of no more than 50°C.

2.    The submerged Emerson elevator motors that are the subject of plaintiff's Complaint are manufactured so as to operate in an ambient temperature of no more than 50°C.

3.    Each of the submerged Emerson elevator motors that are the subject of plaintiff's Complaint was sold with a data plate attached that stated that the motor was to operate at an ambient temperature of no more than 50°C.

4.    Plaintiff Otis knew, or should have known by reasonable investigation, the specifications, tolerances and temperature limitations of the submerged Emerson elevator motors that are the subject of plaintiff's Complaint.

5.    Plaintiff Otis knew, or should have known by reasonable investigation, that the environment into which it was placing the submerged Emerson elevator motors that are the subject of plaintiff's Complaint routinely exceeded 50°C.

6.    In spite of the aforesaid knowledge of Plaintiff Otis, Plaintiff Otis routinely and knowingly exposed the submerged EMERSON elevator motors that are the subject of Plaintiff's Complaint to temperatures that greatly exceeded that product's known and stated limitations.

7.    To the extent that Defendant's products failed in any way, which allegation is specifically denied, said failures were the result of the aforesaid misuse on the part of Plaintiff.

WHEREFORE, defendant, Emerson Electric Co., sued herein as Emerson Electric Company dba U.S. Electrical Motors, Inc., prays this Honorable Court dismiss plaintiff's Counts One, Two, Three and Six so wrongfully brought and award defendant costs.

**THIS DEFENDANT DEMANDS TRIAL BY JURY.**

**Second Affirmative Defense (Counts One, Two and Three--Disclaimer of Warranty)**

NOW COMES the defendant, Emerson Electric Co., sued herein as Emerson Electric Company dba U.S. Electrical Motors, Inc., and, pleading in the alternative and without prejudice to the denials set forth above, states the following Second Affirmative Defense, applicable to plaintiff's Counts One, Two and Three.

1.    At all times relevant, each sale of Emerson elevator motors to Otis was made by purchase order contract, with each such purchase order incorporating by express reference a series of terms and conditions.    A copy of the terms and conditions that governed sales by Emerson to Otis from January 2003 to January 27, 2005 is attached as Exhibit A.    A copy of the terms and conditions that governed said sales from January 27, 2005 though September 2006 is attached as Exhibit B.

2.    Included in said terms and conditions was an express, exclusive limited warranty which warranted that the elevator motors would be free from defects in workmanship and material under normal use.

3.    The sole and exclusive remedies under said express warranty was repair, correction, or replacement of the elevator motors, or refund of the elevator motors' purchase price.

4.    Said warranty specifically disclaimed all other express and implied warranties, stating in relevant part:

> THIS IS THE SOLE AND EXCLUSIVE WARRANTY GIVEN BY USEM WITH RESPECT TO THE PRODUCTS AND IS IN LIEU OF AND EXCLUDES ALL OTHER WARRANTIES, EXPRESS OR IMPLED, ARISING BY OPERATION OF LAW OR OTHERWISE, INCLUDING WITHOUT LIMITATION, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE WHETHER OR NOT THE PURPOSE OR USE HAS BEEN DISCLOSED TO USEM IN SPECIFICATIONS, DRAWINGS OR OTHERWISE.

5.    As such, the express warranty, and the implied warranties of merchantability and fitness for a particular purpose claimed by Otis were specifically disclaimed in the sale of the subject elevator motors, and Otis is barred from seeking recovery under such warranties.

WHEREFORE, defendant, Emerson Electric Co., sued herein as Emerson Electric Company dba U.S. Electrical Motors, Inc., prays this Honorable Court dismiss plaintiff's Counts One, Two and Three, so wrongfully brought, and award defendant costs.

**THIS DEFENDANT DEMANDS TRIAL BY JURY.**

**Third Affirmative Defense (Limitation of Remedies)**

NOW COMES the defendant, Emerson Electric Co., sued herein as Emerson Electric Company dba U.S. Electrical Motors, Inc., and, pleading in the alternative and without prejudice to the denials set forth above, states the following Third Affirmative Defense applicable to all counts of plaintiff's Complaint.

1.      The transactions between plaintiff Otis and defendant Emerson, wherein the latter sold submersible electric motors to the former, were governed by a set of terms and conditions applicable to the sale of said motors.

2.      The terms and conditions relative to the sale of the aforementioned motors by defendant Emerson to plaintiff Otis contained a limitation of damages clause which provided, in pertinent part, that regardless of the form of claim or cause of action, whether based in contract, negligence, strict liability, or otherwise, in no event shall Emerson's liability to Otis and/or to Otis' customers exceed the price paid by Otis for the motors provided by Emerson that gave rise to Otis' claim or cause of action. Further, Otis and Emerson agreed that in no event shall Emerson's liability to Otis and/or Otis' customers extend to include incidental or consequential damages.

3.      By reason of the foregoing, defendant Emerson is not liable to plaintiff Otis for any incidental or consequential damages sought by Otis in its Complaint, and plaintiff's damages, if any, are limited to those recoverable under the terms and conditions attendant to the sale of the subject motors by defendant Emerson to plaintiff Otis.

WHEREFORE, defendant, Emerson Electric Co., sued herein as Emerson Electric Company dba U.S. Electrical Motors, Inc., prays this Honorable Court apply the limitation of

damages provisions as set forth in the terms and conditions relative to the sale of the subject motors by defendant Emerson to plaintiff Otis, and in so doing, bar plaintiff's recovery of any incidental or consequential damages which it seeks in its Complaint, and further, limit the plaintiff's claim to damages, if any, to those allowable under the terms and conditions attendant to the sale of the subject motors by defendant Emerson to plaintiff Otis.

**THIS DEFENDANT DEMANDS TRIAL BY JURY.**

**<u>Fourth Affirmative Defense (Count Six-Proximate Cause/Comparative Fault)</u>**

NOW COMES the defendant, Emerson Electric Co., sued herein as Emerson Electric Company dba U.S. Electrical Motors, Inc., and, pleading in the alternative and without prejudice to the denials set forth above, herein states its Fourth Affirmative Defense to plaintiff's Count Six, to the extent that the allegations contained therein are deemed or construed to be directed against defendant, Emerson.

1-6.    Defendant Emerson reasserts and realleges paragraphs 1-6 of its First Affirmative Defense as fully set forth as paragraphs 1-6 of its Second Affirmative Defense.

7.    Pursuant to 735 ILCS5/6-1116 of the Illinois Code of Civil Procedure, to the extent that the foregoing conduct on the part of plaintiff Otis constituted more than 50% of the combined proximate cause of plaintiff Otis' claimed damages, recovery by plaintiff Otis is barred.

8.    To the extent that plaintiff Otis' fault constitutes 50% or less of the combined proximate causes, its recovery, if any, should be reduced commensurate with plaintiff Otis' fault in causing said damages.

WHEREFORE, defendant, Emerson Electric Co., sued herein as Emerson Electric Company dba U.S. Electrical Motors, Inc., prays this Honorable Court dismiss plaintiff's Count Six so wrongfully brought and award defendant costs.

**THIS DEFENDANT DEMANDS TRIAL BY JURY.**

Respectfully submitted,

**s/ William G. Beatty**
William G. Beatty Bar Number:  03121542
Attorney for Defendant
    Emerson Electric Co.
Johnson & Bell, Ltd.
33 West Monroe Street, Suite 2700
Chicago, IL 60603
Telephone:  (312) 372-0770
Fax:  (312) 372-2881
E-mail:  beattyw@jbltd.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 31, 2008, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

> **s/ William G. Beatty**
> William G. Beatty Bar Number:  03121542
> Attorney for Defendant
>     Emerson Electric Co.
> Johnson & Bell, Ltd.
> 33 West Monroe Street, Suite 2700
> Chicago, IL 60603
> Telephone:  (312) 372-0770
> Fax:  (312) 372-2881
> E-mail:  beattyw@jbltd.com